IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BRIDGETT P. ROBERTSON,
Plaintiff,

v.                                                  Civil No. 3:23cv777 (DJN)

VIRGINIA STATE
UNIVERSITY, *et al.*,
Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the Motion to Dismiss Plaintiff Dr. Bridgett P. Robertson's ("Plaintiff" or "Robertson") Complaint, (ECF No. 1), filed by Defendants Virginia State University ("VSU" or "the University"), Virginia State University Board of Visitors, Mikola M. Abdullah, Tia M. Minnis, Isis N. Walton, Donald E. Palm, Carlton E. Edwards, Valerie Brown, Shavonne Gordon, Pamela Currey, Victor Branch, Joseph A.F. Chase, Thomas Cosgrove, Christine Darden, Robert Denton, Jr., Harold Green, Jr., Leonard Haynes, III, Daphne Meeks, Jon Moore, William Murray, William Kishore Thota and Edward Owens (collectively, "Defendants"). ("Motion" (ECF No. 22).) For the reasons stated herein, the Court will DENY IN PART the Motion, (ECF No. 22), as to Counts I–IV, will GRANT IN PART the Motion as to terminating all Defendants except Defendant "Virginia State University Board of Visitors" and will GRANT Plaintiff LEAVE TO AMEND the Complaint's caption to restyle Defendant "Virginia State University Board of Visitors" as "The Visitors of Virginia State University."

## I.   BACKGROUND

Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), against Defendants, alleging that they discriminated against her on

the basis of sex and then retaliated against her for complaining about this treatment.[1]  Plaintiff also brings discrimination and retaliation claims under the Equal Pay Act of 1963, 29 U.S.C. § 206(d) *et seq.* (the "EPA"), alleging that Defendants paid Plaintiff less than the amounts paid to male employees "for equal work on jobs that require equal skill, effort, and responsibility, and which are performed under similar working conditions."  (Compl. ¶¶ 1–2.)

## A.    Factual Background

At this stage, the Court must accept as true the facts set forth in the Complaint (ECF No. 1).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant motion.

After a career as a news director, anchor and reporter in the television and radio broadcast journalism industry, Plaintiff entered academia in 1989, holding administrative positions at multiple academic institutions before joining the VSU faculty in 2003 as an Adjunct Professor in the Department of Mass Communications ("the Department").  (Compl. ¶¶ 34–35.)  She then became an Assistant Professor and the Department's Internship Coordinator.  (*Id.* ¶¶ 35–36.)  Plaintiff obtained a PhD in Communication, Culture and Media Studies in 2015 and, since

---

[1]    The Complaint gives contradictory information regarding whether Plaintiff also alleges discrimination on the basis of race.  In the "Introduction" section, the Complaint states that Plaintiff brings causes of action "arising from discrimination against her on the basis of her sex **and race**, and retaliation against Dr. Robertson for her complaints about discrimination." (Compl. ¶ 1) (emphasis added).  The Complaint also notes that Plaintiff's Equal Employment Opportunity ("EEO") Charge of Discrimination "included the subject discrimination claims based upon her sex (female) and race (African American) as well as retaliation."  (*Id.* ¶ 20.) However, the Complaint's formal causes of action for discrimination are as follows:  Count I alleges "DISCRIMINATION ON THE BASIS OF SEX UNDER TITLE VII (42 U.S.C. § 2000e-2(a)(1))" and then only discusses sex as the discriminatory basis.  (*Id.* ¶ 151.)  Similarly, Count III only discusses sex, not race.  (*Id.* ¶¶ 161–70.)  Accordingly, the Court concludes that Plaintiff's discrimination claims in the instant lawsuit formally concern only discrimination on the basis of sex.

joining the VSU faculty, has engaged in research and writing projects, served on multiple committees and acted as an advisor for graduate and undergraduate students. (*Id.* ¶¶ 32, 37–38.)

In the spring of 2016, Defendant Carlton Edwards ("Edwards"), who at that time did not qualify as a tenured faculty member, became the Interim Chair of the Department. (*Id.* ¶ 39.) Since 2016, Edwards subjected Plaintiff to verbal hostility, berating her in front of students and staff and interfering with Plaintiff's courses and her instruction of students. (*Id.* ¶ 40.) When Plaintiff complained to VSU's Provost, Dean of the College of Humanities and Social Sciences ("the Dean") and/or human resources personnel, Edwards (a Black man) gave Plaintiff (a Black woman) "lower evaluations as a form of retaliation," and did not treat men or White women in this manner. (*Id.*) In January 2017, Plaintiff lodged a formal complaint with VSU regarding Edwards' behavior, but Edwards nonetheless secured reappointment as Interim Chair of the Department. (*Id.* ¶ 41.) After Plaintiff complained about Edwards, he gave her "unfavorable assignments, tried to take away her role as coordinator of the Department's internship program, suggested that [Plaintiff] needed to teach more courses than anyone else in the Department" and directed her to teach specific courses without her input, while other male faculty members exercised flexibility in choosing courses to instruct. (*Id.* ¶ 42.)

In 2018, Plaintiff voiced her interest in serving as Interim Chair to Defendant Donald E. Palm, III, ("Palm"), VSU's then-Provost and Vice President of Academic Affairs, who told Plaintiff that she would need tenure for that position. (*Id.* ¶ 44.) In September 2018, Plaintiff met with Palm to discuss the alleged harassment, unequal treatment and retaliation by Edwards, along with her concerns regarding VSU's pay practices toward women, and "[s]oon thereafter," Edwards downgraded Plaintiff's performance evaluation in several categories. (*Id.* ¶¶ 45–46.) After Plaintiff then sent a letter in October 2018 to Palm regarding Edwards' behavior, Edwards

3

defunded a symposium that Plaintiff founded, eliminated students' ability to enroll in Plaintiff's internship course and "provided misinformation" about this course. (*Id.* ¶¶ 47–48.)

In April 2019, Plaintiff received a probationary appointment as an Assistant Professor in the Department. (*Id.* ¶ 49.) That same month, she met with Palm and again expressed her interest in becoming Interim Chair of the Department, but Palm again told her that she first needed tenure, despite multiple male faculty members (including Edwards) chairing the Department before they secured tenure themselves. (*Id.* ¶¶ 50–52.)

In August 2019, Plaintiff first applied for tenure. (*Id.* ¶ 53.) As the Department's Interim Chair at the time, Edwards "did not follow the tenure procedures set forth in the Faculty Handbook, refused to meet with Dr. Robertson as is customary, hand-selected inappropriate persons to serve on the peer review committee, and refused to have Dr. Robertson's three-year review prepared," delaying Plaintiff's tenure process. (*Id.* ¶ 55.) In particular, Edwards — allegedly acting beyond the scope of his authority — appointed two of his close friends to Plaintiff's tenure committee, spurring Plaintiff to complain to the Dean at the time. (*Id.* ¶¶ 59–61.) While Plaintiff's complaint led to the formation of a different committee to review her tenure application, Plaintiff alleges that Edwards' actions nonetheless caused her substantial anxiety. (*Id.* ¶ 62.)

In June 2020, Edwards announced that Wellington Gordon, a White man, would assume the Interim Chair role, even though this faculty member did not have tenure or a PhD. (*Id.* ¶ 63.) Plaintiff alleges that this appointment violated provisions of the VSU Faculty Handbook ("Handbook"), which calls for a poll of the faculty at the end of a Chair's term on whether they support renewal of a Chair and stipulates that the Provost, Dean and Department Chair should seriously consider a new Chair if a majority of the faculty opposes reappointment. (*Id.* ¶¶ 69,

4

77.) Pointing to VSU's Department Chair Credentials Policy ("Credentials Policy"), dated February 12, 2020, Plaintiff further states that the selection of Wellington Gordon contravened the Credentials Policy, because (1) he did not hold tenure in the Department when he became Interim Chair; (2) he lacked a terminal degree in Mass Communications or any other discipline in the College of Humanities and Social Sciences; (3) he only qualified as a part-time faculty member in the Department; and (4) the Dean held no election among eligible faculty members. (*Id.* ¶¶ 72–79.)

In late June 2020, Plaintiff wrote to Palm to express her dissatisfaction with the selection of Wellington Gordon as Interim Chair and to reiterate her disapproval of Edwards' behavior toward her and other women employees, and around the same time, she also communicated these concerns to then-Dean Lenneal Henderson ("Henderson"). (*Id.* ¶ 80.) In July 2020, Henderson told Plaintiff that he recommended her for the Chair position but that the Provost refused to appoint her, adding that "when Black women went through the tenure process at VSU, the Provost did not want to approve their tenure, but White women who applied for tenure were approved without the same problems." (*Id.* ¶ 82.)

In August 2020, Plaintiff received an appointment as an Associate Professor with tenure in the Department. (*Id.* ¶ 65.) In December 2020, Plaintiff again wrote to Palm expressing her frustration at Wellington Gordon's appointment as Interim Chair and requesting to be appointed as Chair herself, and Palm wrote in response that "[p]er the Faculty Handbook, it is my official position that changes in the Chair leadership position will occur via a department vote." (*Id.* ¶¶ 83–84.) In April 2021, VSU reappointed Wellington Gordon as Department Chair. (*Id.* ¶ 86.)

In June 2021, Plaintiff met with VSU's President, Defendant Makola M. Abdullah ("Abdullah"), to discuss her views on the Chair position, at which point Abdullah asked Plaintiff

if she was going to sue for discrimination and told her that if she did sue, "he would have to stop having discussions with her and stop his mentoring process with her." (*Id.* ¶ 87.)  In August 2021, just before the start of the fall semester, Wellington Gordon assigned Plaintiff to serve as Graduate Student Advisor and gave her a new set of undergraduate advisees and an additional teaching course. (*Id.* ¶ 88.)

Next, during a November 2021 staff meeting, Wellington Gordon announced that he was stepping down as Chair, and the Interim Dean, Defendant Iris Walton ("Walton"), announced that VSU would hold an election the next semester for the Chair role and that the Provost would no longer appoint the Chair. (*Id.* ¶ 90.)  However, in March 2022, the Provost and Dean appointed an individual who did not work at VSU, Jerry Crawford ("Crawford") (a Black man), as Interim Chair of the Department, a decision that Plaintiff alleges violated VSU policy that called for consultation with and a vote by the faculty. (*Id.* ¶¶ 91–92.)  Plaintiff also contends that Palm "worked to bring" Crawford to VSU "and created a position for him" after Plaintiff complained about not being selected as Interim Chair. (*Id.* ¶ 93.)

In April 2023, Plaintiff won appointment as Assistant Chair of the Department, a post which she asserts "is nearly a full-time job in and of itself" but entails "lower pay and prestige" than the Chair or Interim Chair positions. (*Id.* ¶¶ 95–96.)

Plaintiff follows this narrative with details regarding the alleged deprivation of equal pay for equal work as compared to certain male colleagues.  After overviewing the core responsibilities that VSU faculty members perform (i.e., various teaching, scholarship and service duties), Plaintiff provides salary differentials for herself as compared to male colleagues, alleging that she "and her male comparators performed the foregoing work under similar conditions, most often working in the same building." (*Id.* ¶¶ 98–103.)

6

Delineating her own VSU salary history, Plaintiff states that she earned:

- $45,000 per year from 2008 to 2012 and $48,668 from 2013 through 2014 as an Instructor;

- $60,180 per year from 2015 through the 2017 academic year, $61,985 for the 2018 academic year and $63,985 for the 2019 academic year, all while serving as an Assistant Professor;

- $66,845 for the academic year ending in May 2021, $70,187 per year from 2021 through February 7, 2023, and $80,000 from February 7, 2023 through August 1, 2023, while serving as an Associate Professor;

- $93,333 for the academic year from August 1, 2023 to May 21, 2024, while serving as a tenured Associate Professor and Assistant Chairperson of the Department.

(*Id.* ¶¶ 104–09.) Plaintiff states that during the relevant time period, she taught more students and taught "graduate level courses and research courses which were more intensive and time consuming" as compared to her male comparators in the Complaint, ultimately suggesting that no justification exists for compensating her male colleagues more. (*Id.* ¶¶ 110–11.) Plaintiff adds that she participates in more committees and conducts more service work for the Department than do the male faculty members in the Department. (*Id.* ¶ 114.)

By comparison, the Complaint alleges that Duane Byrge ("Byrge") (a White man who served as a non-tenured Assistant Professor in the Department) made more money than did Plaintiff for similar work, i.e., when they both served as Assistant Professors, and that when Plaintiff received tenure and a promotion to Associate Professor in 2020, she still earned less than Byrge that year. (*Id.* ¶¶ 115–18.) Similarly, the Complaint states that Edwards taught the same or fewer courses per semester as compared to Plaintiff but "was paid considerably more than" Plaintiff for numerous years, including when he was no longer Interim Chair. (*Id.* ¶¶ 119–22.) Wellington Gordon earned $103,409 in 2020, even though he did not have a PhD, while Plaintiff earned $66,845 that year as a tenured Associate Professor with a PhD. (*Id.* ¶ 127.) And

7

Wellington Gordon (who no longer serves as Interim Chair) earns in excess of $100,000, while Plaintiff earns $93,333. (*Id.* ¶ 128.) VSU also allowed Eric Jackson ("Jackson") (a Black man who serves as a non-tenured Assistant Professor in the Department and who does not hold a PhD) to join the faculty as an Assistant Professor, while Plaintiff could not receive this title until she earned her PhD, and Jackson made more money than Plaintiff did in 2020 and 2021. (*Id.* ¶¶ 129–34.)

The Complaint further alleges that Willis Smith ("Smith") (a Black man who serves as a non-tenured Instructor in the Department) earned more per year than Plaintiff did from 2018 through 2022, despite performing (as with the other male comparators) substantially similar work. (*Id.* ¶¶ 135–38.) Additionally, the Complaint names four other individuals who worked for the Department during at least some part of the relevant time period who either earned more money than did Plaintiff or who possessed fewer qualifications than she does but nonetheless made comparable salaries and/or held comparable titles. (*Id.* ¶¶ 139–43.)

Lastly, Plaintiff points to Cheryl Johnson (a Black woman with a PhD who serves as a tenured Associate Professor in the Department) who, like Plaintiff, has earned "considerably less than her male counterparts" for numerous years. (*Id.* ¶¶ 144–46.)

## B.  Procedural History

Before filing an action in this Court, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") "[o]n or about September 3, 2021," pursuant to the EEOC's work-sharing agreement with the Virginia Division of Human Rights. (*Id.* ¶ 19.) On August 17, 2023, the EEOC dismissed Plaintiff's Charge of Discrimination. (*Id.* ¶ 21.)

8

On November 15, 2023, Plaintiff filed her Complaint with this Court, bringing four claims. Count I constitutes a Title VII disparate-treatment claim, alleging that Defendants discriminated against Plaintiff on the basis of sex by permitting less experienced male employees to occupy higher positions and leadership roles and by paying men more than women "for work substantially equal in skill, effort, and responsibility under similar working conditions." (Compl. ¶¶ 151–52.) Count II brings a Title VII retaliation claim, alleging that Plaintiff engaged in protected activity by reporting the discrimination that she faced and her unequal pay to VSU and that, in response, Defendants retaliated against her by:

> denying her an opportunity to serve as Interim Chair for additional pay, forcing her to teach additional courses without extra pay, giving her baseless negative evaluations, pulling resources from programs she developed, verbal harassment, reducing availability of courses taught, refusing to provide advancement opportunities that are afforded to male colleagues, blocking and interfering her tenure process, coercing her to provide certain student grades and outcomes and denying her a third-year review.

(*Id.* ¶¶ 157–58.) Count III brings an EPA discrimination claim, alleging that VSU paid Plaintiff less than similarly situated male faculty members in her department received for comparable levels of work. (*Id.* ¶¶ 162–63.) In Plaintiff's telling, which the Court takes to be true at this stage, her job required at least as much effort, skill and responsibility (and entailed similar working conditions) as those of her similarly situated male colleagues. (*Id.* ¶¶ 165–66.) Finally, Count IV alleges that Defendants engaged in unlawful retaliation in violation of the EPA for the same reasons as set forth in Count II. (*Id.* ¶¶ 171–76.)

The Complaint names as Defendants a lengthy litany of entities and individuals: VSU; Abdullah, VSU's President; Palm, who served as Provost and Vice President of Academic Affairs until August 2023; Tia A. Minnis ("Minnis"), VSU's Interim Provost and Vice President of Academic Affairs; Walton, the Dean; Edwards; the "VSU Board of Visitors"; Valerie Brown, Shavonne Gordon and Pamela Currey (Rector, Vice Rector and Secretary of the Board of

Visitors, respectively); and Victor Branch, Joseph A.F. Chase, Jr., Thomas Cosgrove, Christine M. Darden, Robert Denton, Jr., Harold Green, Jr., Leonard Haynes, III, Daphne Meeks, Jon Moore, William Murray, William Thota and Edward Owens (the other members of VSU's Board of Visitors).

On February 16, 2024, Defendants filed the instant Motion to Dismiss, asserting that the Complaint fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 22.) On March 1, 2024, Plaintiff responded in opposition to the Motion. (ECF No. 24.) On March 7, 2024, Defendants replied, rendering the Motion ripe for review. (ECF No. 25.)

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the plaintiff's well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations

10

omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III.    ANALYSIS

#### A.    Proper Defendants

The Court begins by assessing Defendants' argument that the Court should dismiss twenty-one of the twenty-two named Defendants. As a threshold issue, Defendants highlight that VSU's corporate name constitutes "The Visitors of Virginia State University," not "Virginia State University Board of Visitors" as stated in the Complaint. (Defs.' Mem. in Supp. of Mot. to Dismiss (ECF No. 23) ("Defs.' Mem.") at 10, citing Va. Code § 23.1-2700.) Plaintiff concedes this point, requesting leave to amend the caption of the Complaint to substitute "The Visitors of Virginia State University" as the proper named defendant for VSU's Board of Visitors. (Pl.'s Opp. to Mot. to Dismiss (ECF No. 24) ("Pl.'s Opp.") at 6 n.1.) But Plaintiff ignores that "The Visitors of Virginia State University" and VSU do not qualify as two separate entities. Rather, Virginia law provides that "The Visitors of Virginia State University" constitutes the legally defined corporate entity. Va. Code § 23.1-2700. The Court therefore accepts Defendants' argument that this action cannot proceed with VSU and "The Visitors of Virginia State University" as two separate Defendants. Accordingly, the Court will hereby (1) instruct the Clerk to TERMINATE Defendant "Virginia State University" from this action; and (2) grant

11

Plaintiff LEAVE TO AMEND the Complaint's caption to restyle Defendant "Virginia State University Board of Visitors" as "The Visitors of Virginia State University." For ease of reference in this Memorandum Opinion, however, the Court employs "VSU" or "the University" to stand for the legally defined corporate entity.

Regarding the Title VII claims, Defendants contend that Plaintiff cannot sue the individual defendants under Title VII, because only VSU (again, in its correct corporate form, "The Visitors of Virginia State University") meets the statutory definition of an "employer." (Defs'. Mem. at 10.) Fourth Circuit case law clearly establishes that "supervisors are not liable in their individual capacities for Title VII violations." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998). Plaintiff concedes this issue. (Pl.'s Opp. at 5–6.) Accordingly, the Court will hereby DISMISS Counts I and II, i.e., the Title VII claims, against all Defendants except "The Visitors of Virginia State University."[2]

Plaintiff also accedes to the dismissal of the individual members of the Board of Visitors ("the Board") as Defendants. (*Id.* at 6.) Because Plaintiff does not plausibly allege that these Defendants qualify as "employers" for the EPA claims and does not rebut Defendants' sound arguments to the contrary, the Court will therefore instruct the Clerk to DISMISS the following Defendants from this action: Valerie Brown, Shavonne Gordon, Pamela A. Currey, Victor Branch, Joseph A.F. Chase, Jr., Thomas Cosgrove, Christine M. Darden, Robert Denton, Jr., Harold Green, Jr., Leonard Haynes, III, Daphne Meeks, Jon Moore, William Murray, William Thota and Mr. Edward Owens.

---

[2]     For clarity, prior to Plaintiff amending the Complaint's caption to reflect VSU's proper corporate name, the Complaint may proceed against "Virginia State University Board of Visitors." Once Plaintiff recaptions the Complaint with the correct corporate name for the Board of Visitors, then the Complaint may only proceed against "The Visitors of Virginia State University."

Nonetheless, Plaintiff argues that Defendants Abdullah, Minnis, Palm, Walton and Edwards all qualify as proper Defendants in their individual capacities for Counts III–IV, i.e., the EPA claims, because they constitute "employers" of Plaintiff under 29 U.S.C. § 203(d). Defendants disagree. (Defs.' Reply Br. (ECF No. 25) ("Defs.' Reply") at 6.) The Court therefore must "examine the Complaint's allegations regarding each Individual Defendant's role and, assuming the truth of those allegations, decide if each Individual Defendant plausibly falls within the FLSA's definition of employer." *Davis v. Comcast Corp., Inc.*, 2014 WL12663202, at *2 (E.D. Va. July 1, 2014).

With the passage of the EPA, Congress amended the Fair Labor Standards Act ("FLSA") to prohibit employers from engaging in sex-based discrimination in the paying of wages. 29 U.S.C. § 206(d)(1). But when determining whether an individual qualifies as an "employer" for EPA liability purposes, "the statute's text is of little help, as it merely states that an 'employer' is 'any persons acting directly or indirectly in the interest of an employer in relation to an employee[.]'" *Acosta v. JM Oska Inc.*, 270 F. Supp. 3d 907, 912 (E.D. Va. 2017).

In light of this lack of statutory clarity, the Fourth Circuit has held that to determine if an individual qualifies as a FLSA "employer," courts should apply a multi-factored "economic reality test" that considers whether the individual: "(1) has the power to hire and fire the employees, (2) supervise[s] and control[s] employee work schedules or conditions of employment, (3) determine[s] the rate or method of payment, and (4) maintain[s] employment records." *Id.* (quoting *Kerr v. Marshall Univ. Board of Governors*, 824 F.3d 62, 83 (4th Cir. 2016).) While "no one factor is dispositive," 824 F.3d at 83, this Court has placed particular weight on the third factor, i.e., whether a defendant participates in setting payment rates, amounts or methods. *See, e.g., Chambers v. DXC Tech. Servs., LLC*, 2020 WL 9348158, at *8

13

(E.D. Va. Nov. 20, 2020) (characterizing the third factor as "perhaps the most important");
*Acosta*, 270 F. Supp. 3d at 913 (same). The Court therefore applies the *Kerr* test to each of the
five Defendants whom Plaintiff alleges qualify as liable in their individual capacities under the
EPA, with special attention given to the third factor.

### 1.    Defendant Abdullah

The Complaint alleges that Abdullah participated in the practice and adoption of VSU's
Credentials Policy for the appointment of department chairs. (Compl. ¶¶ 67–76). But "[m]ere
involvement in the hiring process, by itself, is not enough to make an employee an FLSA
'employer.'" *Acosta*, 270 F. Supp. 3d at 912. Plaintiff's opposition brief includes the conclusory
statement that each of the five remaining individual Defendants "have, and among them have
had, the power to hire and fire Dr. Robertson, supervised and controlled her work schedules and
conditions of employment, determined her pay, or maintained her employment records." (Pl.'s
Opp. at 7.) But the fact, standing alone, that the President formally approved the Credentials
Policy does not mean that Abdullah can hire and fire employees. The Complaint alleges that
Abdullah threatened Plaintiff that, if she sued for discrimination, he would stop talking to her
and mentoring her, but does not allege that he threatened to fire her. (Compl. ¶ 87.) The first
factor therefore counts against finding Abdullah to be a FLSA "employer."

Furthermore, the Complaint does not allege that VSU's President can supervise or control
employee work schedules or conditions of employment, nor that he maintains employee records.
The second and fourth factors thus indicate that Abdullah does not qualify as an "employer."

Regarding the third factor, the Complaint alleges that VSU's President possesses the
power to recommend faculty salaries, while noting that the Board holds final approval authority
on this matter. (Compl. ¶ 30.) With his advisory role, Abdullah lacks the type of "ultimate

14

authority concerning recommendations about compensation" that the Court has held sufficient for meeting the third factor. *Chambers*, 2020 WL 9348158, at *8. However, the allegation that VSU's President can recommend salaries to the University's highest governing body suggests that Abdullah at least *helps* determine the payment rates and methods for faculty members. At the motion-to-dismiss stage, Plaintiff does not need to (and indeed likely cannot) produce evidence of how frequently the Board accepts the VSU President's recommendations. *See Aguirre v. Joe Theismann's Rest.*, 2019 WL 12267459, at *4 (E.D. Va. July 23, 2019) (noting that "courts have recognized that at the pleading stage it may be difficult for a Plaintiff to identify with precision the various Defendants' roles"). Accordingly, the Court finds that the third prong weighs only slightly against Abdullah qualifying as an "employer."

In sum, the Court finds that the balance of the *Kerr* factors indicates that Abdullah does not constitute a proper "employer" for EPA purposes.

### 2.    Defendant Minnis

The Complaint names Minnis as a Defendant, because she became VSU's Interim Provost and Vice President for Academic Affairs in the summer of 2023. (Compl. ¶¶ 6–7.) Defendants argue that the timing of Minnis' assumption of these administrative positions precludes her inclusion as a proper EPA defendant, because the summer of 2023 falls well after any alleged pay violations and after Plaintiff received a salary increase to $93,333 for the academic year from August 1, 2023 to May 21, 2024. (Defs.' Mem. at 14.) Retorting that Minnis "is aware" of sex discrimination and unequal pay issues but "has done nothing and continues to do nothing," Plaintiff asserts that she qualifies as a proper individual defendant. (Pl.'s Opp. at 8.)

15

However, rather than describing "each Individual Defendant's role," *Davis*, 2014 WL12663202, at *2, the Complaint simply describes the general duties of VSU's Provost, (Compl. ¶ 29), devoid of any allegations that Minnis *individually* participated in the relevant conduct. Although Plaintiff's opposition brief asserted that Minnis "is aware" of the allegations here and "has done nothing and continues to do nothing," (Pl.'s Opp. at 8), the Complaint itself does not link Minnis with the alleged discriminatory policies and practices. Indeed, as the Complaint states, Plaintiff filed a Charge of Discrimination with the EEOC in September 2021, and the EEOC dismissed the Charge of Discrimination in August 2023, i.e., around the time that Minnis became interim Provost. (Compl. ¶¶ 7, 19–21.) Plaintiff therefore asks the Court to deem Minnis a proper defendant merely on the basis that she *now* occupies the Provost and Vice President for Academic Affairs posts, rather than due to any alleged conduct by Minnis herself.

When applying the *Kerr* test, this Court has consistently assessed whether complaints plausibly alleged that an individual defendant qualified as an "employer" based on *prior* conduct. *See, e.g.*, *Walsh v. Fam. First Home Healthcare LLC*, 2023 WL 9317547, at *1, 3 (E.D. Va. July 21, 2023) (finding an individual who, "[a]t all relevant times," allegedly served as the "sole member and administrator" of business and managed "the company's daily operations and employment practices" to qualify as an "employer"); *Chambers*, 2020 WL 9348158, at *6–8 (applying factors to past conduct of individual defendant); *Acosta v. At Home Pers. Care Servs. LLC*, 2019 WL 1601997, at *13 (E.D. Va. Apr. 15, 2019) (finding that defendant "was the sole owner and president of [company] during the relevant time period and exercised substantial control over the policies, job responsibilities, and day-to-day functioning of the" entities at issue). To take just one factor as an example, the Complaint offers no evidence that Minnis exercised the power to hire or terminate Plaintiff during the multiple years in which she alleges

16

ongoing discriminatory conduct. *Cf. Pili v. Patel*, 2019 WL 180185, at *10 (E.D. Va. Jan. 11, 2019) (finding that individual defendants "exercised the power to hire and fire"). And, "[g]iven that the purpose of the FLSA is to remedy failure to pay employees, the lack of any allegations linking [Minnis] to payment decisions weighs significantly against finding [her] to be an FLSA 'employer.'" *Acosta*, 270 F. Supp.3d at 913.

In light of the Complaint's lack of plausible allegations regarding Minnis' *individual* role, Minnis cannot satisfy the *Kerr* multifactor test.

### 3.    Defendant Palm

As to Defendant Palm (who served as Provost until about August 2023), the Complaint offers more. Plaintiff states that Palm informed her in March 2021 that he had requested that all VSU deans provide recommendations to his office regarding department leadership changes. (Compl. ¶¶ 6, 84.) The Complaint also alleges that (1) Palm "worked to bring" Crawford to VSU "and created a position for him," thereby preventing Plaintiff from becoming Interim Chair of the Department; and (2) Dean Henderson told Plaintiff in July 2020 "that when Black women went through the tenure process at VSU, the Provost did not want to approve their tenure, but White women who applied for tenure were approved without the same problems." (*Id.* ¶¶ 82, 93.) Furthermore, Plaintiff alleges that VSU policies provide that the Provost and Dean may accept or reject faculty members' endorsed candidates for departmental chairs. (*Id.* ¶ 67.)

Regarding the first *Kerr* factor, the allegations that Palm used his power as Provost to gather input from deans regarding hiring departmental leadership, "created a position" for a particular faculty member to allow him to leapfrog over Plaintiff for the Interim Chair post and blocked Black women from securing tenure indicate that he exercised power over hiring

17

employees. (*Id.*) This factor thus weighs in favor of Palm qualifying as an "employer" for FLSA purposes.

Regarding the second factor, the Complaint does not contain detailed allegations that Palm supervised and controlled Plaintiff's or other faculty members' work schedules. As noted above, the Complaint states that the Provost's duties include "recruitment, retention, and development of the faculty and staff, management and oversight of the budget, and implementation of policies and procedures affecting faculty and staff," but does not tie these general duties to controlling Plaintiff's work schedule. (Compl. ¶ 29.)

However, this Court found in *Chambers* that where a company executive had allegedly reviewed an employee's complaints regarding her employee classification or "status" but "declined to change her status," such allegations supported a finding that the executive held authority "to approve or reject recommendations concerning her conditions of employment." *Chambers*, 2020 WL 9348158, at *7. Here, the Complaint alleges that Dean Henderson informed Plaintiff that Palm "did not want to approve" Black women's applications for the status of tenure, and that "White women who applied for tenure were approved without the same problems." (Compl. ¶ 82.) In the world of academia, whether a tenure-track faculty member possesses the status of tenure reasonably constitutes a crucial "condition of employment." *See McMahon v. Carroll Coll.*, 2007 WL 804149, at *24 (E.D. Wis. Mar. 9, 2007) ("The general rule in academia is that if a faculty member is denied tenure, he or she completes a terminal year of employment and then leaves the institution."); *Lamphere v. Brown Univ.*, 491 F. Supp. 232, 243–44 (D.R.I. 1980), *aff'd*, 685 F.2d 743 (1st Cir. 1982) (listing tenure among various "conditions of employment" in a Title VII case). Based on Palm's alleged role in facilitating disparities in the tenure process, the second factor weighs in favor of Palm qualifying as an "employer."

18

Moving to the third factor, the Complaint does not allege that Palm determined the rate or method of payment for Plaintiff or other faculty members. Indeed, the Complaint states plainly that "[f]aculty salaries at VSU are set by its Board of Visitors." (Compl. ¶ 27.) To the extent that tenured academic positions correspond with higher salaries, Palm's alleged role in delaying tenure applications somewhat bears on this factor. But the Complaint does not allege that Palm maintained "ultimate authority concerning recommendations about compensation." *Chambers*, 2020 WL 9348158, at *8. This factor therefore cuts against finding that Palm counts as an "employer." And regarding the fourth factor — whether an individual defendant maintains employment records — the Complaint offers nothing for Palm. *See Acosta*, 270 F. Supp. 3d at 913 (explaining that mere "access to employment records [is] a fact other courts have appropriately found insufficient to support an inference that an individual is an employer").

Viewing the facts in the light most favorable to Plaintiff, *Mylan Lab'ys*, 7 F.3d at 1134, the Court therefore concludes that the scoreboard for Palm totals two *Kerr* factors weighing in favor and two factors weighing against him qualifying as a proper individual defendant. The analysis of Palm presents a close question. Ultimately, though, while "no one factor is dispositive," *Kerr*, 824 F.3d at 83, because this Court has found that the third factor, i.e., whether a defendant participates in setting payment rates, amounts or methods, carries particularly heavy weight, the Court finds that the Compliant does not clear the bar with respect to Palm's inclusion as a Defendant. *Chambers*, 2020 WL 9348158, at *8; *Acosta*, 270 F. Supp. 3d at 913.

### 4.     Defendant Walton

As to Defendant Walton, the Dean of VSU's College of Humanities and Social Sciences, the Complaint alleges that during a November 2021 staff meeting in which Wellington Gordon announced his departure as Interim Chair of the Department, Walton "said that there would be an

19

election the next semester to elect a new Chair and the Provost would not appoint Chairs any longer." (Compl. ¶ 90.) The Complaint then alleges that Walton and the Provost appointed Jerry Crawford as Interim Chair in March 2022 "without consulting faculty in the Department and without holding an election in accordance with University policy," and that "[f]or years," the Dean and Provost selected "less qualified men" to serve as Chair or Interim Chair, passing over Plaintiff. (*Id.* ¶¶ 91–92, 97.) Viewing these alleged facts in the light most favorable to Plaintiff leads to an inference that Walton possessed the power to hire and fire employees. *Mylan Lab'ys*, 7 F.3d at 1134. The first factor thus favors finding that Walton qualifies as an "employer."

Regarding the second factor, the Complaint does not allege that Walton exercised *general* supervisory power or control over employee work schedules or conditions of employment. However, the Complaint does state that Plaintiff accepted an assignment to work with Walton on a website project, which presumably entailed some level of supervision by Walton. (Compl. ¶ 66.) Moreover, Plaintiff alleges that after involving Walton's predecessor as Dean, Lenneal Henderson, in her tenure review process, Plaintiff "was able to have a different committee formed to review her tenure application." (*Id.* ¶ 62.) The Complaint thus suggests that the occupant of the Dean's role could exercise *some* level of influence over the tenure process which, as discussed *supra*, could qualify as a "condition of employment." Although not strongly weighing in either side's favor, this factor therefore tilts slightly toward finding that Walton qualifies as an "employer."

However, the Complaint offers no evidence that Walton determined the rate or method of payment for Plaintiff or other employees, nor that he maintained employment records. The third and fourth factors thus cut against finding Walton to qualify as an "employer."

20

In sum, one factor clearly supports finding that Walton qualifies as an "employer," one factor tilts slightly toward such a finding and two factors clearly cut against doing so. The Court balances these factors to conclude that Walton does not qualify as a proper individual defendant.

### 5.     Defendant Edwards

Lastly, as to Defendant Edwards, former Interim Chair of the Department, the Complaint does not plausibly allege that Edwards possessed the power to hire and fire employees. While Plaintiff's opposition brief contends that "he was involved in the selection of his unqualified successors as chair of the Department to the exclusion of" Plaintiff, (Pl.'s Opp. at 8), the Complaint lacks details indicating that he had ultimate authority to make hiring decisions. And "[m]ere involvement in the hiring process, by itself, is not enough to make an employee an FLSA 'employer.'" *Acosta*, 270 F. Supp. 3d at 912. Edwards does not satisfy the first factor.

In contrast, the Complaint abounds with allegations that Edwards supervised and controlled Plaintiff's work schedule or conditions. For instance, Plaintiff alleges that Edwards (1) gave her unfavorable assignments, (2) eliminated students' ability to enroll in her internship course, (3) directed her to teach specific courses without consultation and (4) gave her negative counseling and downgraded evaluations. (Compl. ¶¶ 40–48.) The second factor thus clearly weighs in favor of Edwards qualifying as an "employer."

Regarding the third factor, the Complaint does not allege that Edwards determined payment rates or methods. And while Edwards completed evaluations of Plaintiff, the Complaint does not allege that he maintained employment records for her. (*Id.* ¶¶ 40, 46.) Both the third and fourth factors thus cut against finding Edwards to qualify as an "employer."

Accordingly, the balance of the factors weighs in favor of finding that Edwards does not constitute an "employer" for EPA purposes.

21

In sum, no individual Defendant qualifies as an "employer" for the purpose of Plaintiff's EPA claims. The Court will therefore instruct the Clerk to DISMISS Abdullah, Minnis, Palm, Walton and Edwards as Defendants in this action. The University itself constitutes the only proper remaining Defendant, so the Court now turns to assessing whether Plaintiff's Title VII and EPA claims against the University survive Rule 12(b)(6) scrutiny.

## B.    Count I—Title VII Disparate Treatment

Defendants argue that Count I, Plaintiff's Title VII sex discrimination claim, fails to state a factually plausible or legally cognizable disparate treatment claim. (Defs.' Mem. at 14.)  Title VII provides that an employer cannot "discriminate against any individual with respect to [her] compensation . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  "Title VII, in contrast to the Equal Pay Act, requires establishing *intentional* discrimination."  *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019) (emphasis added).  To make such a showing, Plaintiff must either (a) provide direct or circumstantial evidence or (b) rely on the burden-shifting framework given by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (U.S. 1973) to bring a prima facie case of sex discrimination.  *Spencer*, 919 F.3d at 207.

The Court briefly considers whether the Complaint plausibly alleges direct evidence of sex discrimination under Title VII, and concludes that it does not.  "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  *Whitley v. SecTek, Inc.*, 2022 WL 874167, at *6 (E.D. Va. Mar. 23, 2022) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir 2006), *abrogated in part on other grounds by Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167 (2009)).  Plaintiff argues that the Complaint's allegation that Palm lied to her about the

necessity of tenure for becoming Department Chair even though he and other VSU administrators repeatedly appointed untenured male faculty members as Chair presents direct evidence of sex discrimination. (Pl.'s Opp. at 11.) But the Complaint states that this alleged conversation occurred in 2018, while the other relevant instances that Plaintiff points to in her opposition brief allegedly also occurred before the relevant cutoff date for discrete acts that could give rise to Title VII sex discrimination, as explained *infra*. (*Id.*, citing Compl. ¶¶ 44, 51, 63.) Plaintiff does not present direct evidence that Palm's assertion regarding the necessity of tenure for serving as Chair somehow connected to Plaintiff's sex, so even if viewing the alleged facts as true, the Court cannot plausibly infer that, standing alone, they give rise to Title VII liability.

Plaintiff also highlights her alleged June 2021 conversation with Abdullah, in which he allegedly threatened her with cutting off mentorship if she filed an EEOC Charge of Discrimination against VSU. (Pl.'s Opp. at 11, citing Compl. ¶ 87.) Whether this alleged conduct supports a Title VII *retaliation* claim constitutes a different question than whether the allegation supports a Title VII *sex discrimination* claim. As Defendants note, the Complaint lacks facts to connect her conversations with Palm in 2018 and Abdullah in 2021, instead merely alleging that Plaintiff met with Abdullah to discuss "ongoing issues with the Chair position in the Department." (Defs.' Reply at 10.) And Plaintiff's argument about her alleged conversation with Henderson in July 2020 fails to establish direct evidence, for the reasons stated *infra* regarding Title VII's statute of limitations.

In sum, rather than plausibly alleging facts that reflect a discriminatory attitude and that bear directly on contested employment decisions, *Warch*, 435 F.3d at 520, Plaintiff piles inference upon inference. By failing to establish a nexus between VSU's payment and promotion of different faculty members, on the one hand, and Plaintiff's sex, on the other hand,

23

the Complaint fails to plausibly allege *direct* evidence of sex discrimination under Title VII.  The Court next considers whether the Complaint contains sufficient factual allegations to establish a *prima facie* case for disparate-treatment discrimination on the basis of sex.

In a prima facie discrimination case, Plaintiff must show that "(1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 572 (4th Cir. 2023).  And in a pay-disparity case with a female plaintiff, the circumstances that "suggest an unlawfully discriminatory motive" generally come from "the existence of a male comparator." *Id.*

At the motion-to-dismiss stage, "an employment discrimination plaintiff need not plead a prima facie case of discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022).  Rather, Plaintiff "must allege sufficient facts to satisfy the elements of a cause of action created by [the applicable] statute." *Felder v. MGM Nat'l Harbor, LLC*, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022).  Plaintiff must therefore allege facts that "plausibly state a violation of Title VII above a speculative level." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020).

Here, Defendants argue that Plaintiff fails to satisfy the third and fourth prongs of the above test for pleading a prima facie sex discrimination claim under a disparate treatment theory: (1) that an adverse employment action occurred and (2) that the circumstances suggest an unlawfully discriminatory motive as illustrated by more favorable treatment of similarly situated male comparators.  (Defs.' Mem. at 15–16.)[3]

---

[3]     As an initial matter, the Parties dispute the relevance of the Handbook's "Pay-for-Performance" guidelines and details regarding faculty hiring processes and the selection of departmental chairs, which Defendants cite to as evidence that Plaintiff cannot plausibly allege

First, Defendants argue that Plaintiff cannot plausibly allege that she suffered an adverse action, because Title VII procedurally time-bars these allegations. (*Id.*) Outside the context of hostile-work-environment claims, discrete discriminatory acts do not qualify as actionable if they are time-barred, even if they *relate* to acts that are not themselves time-barred. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102, 110–114 (2002) (holding that only acts that occurred within 300 days of the filing of an employment discrimination charge with the appropriate administrative agency qualified as actionable, as Title 42 U.S.C. § 2000e–5(e)(1) provides for a 300-day filing timeline). Because Plaintiff filed her Charge of Discrimination with the EEOC on September 3, 2021, she cannot recover under Title VII from discrete discriminatory acts that allegedly occurred before November 7, 2020.[4]

Defendants point to the Complaint's allegations regarding Edwards' conduct as Interim Chair of the Department as time-barred, because Edwards departed the Interim Chair post in

---

discrimination on the basis of sex. (Defs.' Opp. at 4 n.2, 5–6, 20.) For example, Defendants argue that because Plaintiff does not explain whether she availed herself of the Handbook "Pay-for-Performance" guidelines, she cannot plausibly allege that the various male comparators qualified as similarly situated to her in all relevant respects. (*Id.* at 20– 21.) Plaintiff argues that the Court should disregard this evidence. (Pl.'s Opp. at 3–5.) But in ruling on a motion to dismiss, courts "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). Here, the parties do not dispute the authenticity of Defendants' citations to the Handbook, and VSU's policies regarding departmental chairs, faculty hiring and salaries appears to qualify as integral to the Complaint. However, at the pleading stage, the Court, even after considering the Handbook's relevant passages, cannot discern whether VSU properly followed these policies, and viewing the pleaded factual allegations in the light most favorable to Plaintiff, *Mylan Lab'ys*, 7 F.3d at 1134, the Court therefore declines to dismiss Plaintiff's discrimination claims simply on account of the Handbook's stated policies.

[4]     Defendants initially pointed to November 25, 2020 as the cutoff date. (Defs.' Mem. at 16.) However, as Plaintiff identifies, November 7, 2020 constitutes the proper cutoff date for the 300-day filing window for Title VII liability here, based on Plaintiff's Charge of Discrimination dated September 3, 2021. (Pl.'s Opp. at 9.) Defendants correct their mistake in their Reply Brief. (Defs.' Reply at 10.)

June 2020, i.e., before November 2020. (Defs.' Mem. at 17.)  Plaintiff's opposition brief does not address whether allegations about Edwards' conduct stand as time-barred, apparently conceding the statute-of-limitations issue as to those allegations.  Because Plaintiff's allegations concerning Edwards' conduct as Interim Chair involve discrete acts that occurred before November 7, 2020, they qualify as time-barred and cannot support a Title VII action. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.  Similarly, Plaintiff's allegation that VSU inappropriately passed over her for Department Chair in June 2020 is time-barred. (Compl. ¶ 63.)  And for the same reasons, because the alleged July 2020 conversation in which Henderson told Plaintiff that he recommended her for the Chair position but that Palm refused to appoint her (and the underlying alleged decision regarding the appointment of the chair) took place earlier than November 7, 2020, this allegation cannot support Count I's survival.

Plaintiff argues, however, that other allegations are not time-barred. (Pl.'s Opp. at 10.)  For instance, the Complaint alleges that Plaintiff corresponded with Palm from December 2020 through March 2021 regarding her view that VSU improperly passed over her for Department Chair in favor of Wellington Gordon, and that VSU reappointed Wellington Gordon as Chair in April 2021. (Compl. ¶¶ 83–86.)  The Complaint also alleges that Walton and Palm in March 2022 hired an external male candidate as Chair without consulting Department faculty in an effort to prevent Plaintiff from becoming chair, (*id.* ¶¶ 90–93), and that VSU has in recent years paid lesser- or comparably-qualified males more for substantially similar work under similar working conditions, (*id.* ¶¶ 98–143).  These allegations concern events that occurred within the 300-day window of November 7, 2020.  Moreover, they relate to VSU's alleged failure to promote Plaintiff on account of her sex, and denying an opportunity for promotion can constitute an adverse employment action for a Title VII discrimination claim. *Holland v. Washington*

*Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).  As to the alleged pay disparities *since* November 2020, individuals can bring a Title VII claim based on unequal pay for equal work. *Becker v. Gannett Satellite Info. Network, Inc.*, 10 F. App'x 135, 139 (4th Cir. 2001). Accordingly, the statute of limitations does not pose an absolute bar to Count I, as Plaintiff has pleaded timely allegations that plausibly could count as adverse employment actions.

The Court next considers Defendants' argument that the Complaint lacks sufficient facts to support the comparator element of a disparate-treatment claim under Title VII.  (Defs.' Mem. at 18–21.)  Defendants argue that as Plaintiff did not qualify as a tenure-track Assistant Professor until the 2015–16 academic year, Edwards and Byrge cannot serve as valid comparators, because Edwards had tenure (and was Interim Department Chair, thereby carrying a lighter courseload than Plaintiff), and Byrge constituted a tenure-track Assistant Professor "long before" Plaintiff got on the tenure track.  (*Id.* at 18–19.)  Defendants add that Plaintiff fails to provide facts regarding Byrge's background and past teaching experience.  (*Id.* at 19.)  Disputing the relevance of the Complaint's other male comparators, Defendants argue that Wellington Gordon taught courses in a different department and served as Interim Chair, thereby rendering him far from "similarly situated" to Plaintiff, while Jackson and Smith maintained different coursework focus areas than did Plaintiff.  (*Id.*)  Furthermore, Defendants highlight that the Complaint posits salary data for multiple other comparators only from years that precede the November 7, 2020 cutoff date.  (*Id.* at 19–20.)

As all Parties agree, *Spencer*, in which the Fourth Circuit held that Title VII requires that compared jobs stand as only "similar" rather than "equal," constitutes binding guidance on Title VII sex discrimination claims.  *Spencer*, 919 F.3d at 207.  There, the Fourth Circuit identified several factors that courts consider for finding whether two jobs qualify as "similar" under Title

VII: "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications — provided the employer considered these latter factors in making the personnel decision." *Id.* As Plaintiff notes, *Spencer* examined "similarly situated" jobs at the summary-judgment stage. (Pl.'s Opp. at 16.) Here, at the motion-to-dismiss stage, Plaintiff must plead "facts which give rise to the inference" that she and her comparators "are similarly situated in all relevant respects." *Altuzarra v. Loudoun Cnty. Sch. Bd.*, 2020 WL 13690343, at \*4 (E.D. Va. May 5, 2020). At the same time, "evidentiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made" at the pleading stage. *Woods v. City of Greensboro*, 855 F.3d 639, 650 (4th Cir. 2017).[5]

For the reasons set forth *supra*, Plaintiff cannot use salary data before the November 7, 2020 cutoff date for the Title VII statute of limitations to support Count I. However, she *does* present allegations that some of her male comparators secured the Department Chair position (in the case of Wellington Gordon's reappointment in April 2021) and/or received more pay for substantially equal work under similar working conditions *since* November 2020. (Compl. ¶¶ 86, 118, 121, 128, 134, 137.) And while Defendants portray the Complaint's comparators as distinguishable, the Court notes the Fourth Circuit's observation that such evidentiary

---

[5]      In their Reply, Defendants make much of the Complaint's references to Cheryl Johnson, another female faculty member, arguing that the Complaint's statement that Johnson made more money than did Plaintiff from 2015–2017 negates an inference of sex-based animus. (Defs.' Reply at 15.) But as Defendants themselves highlight, factual allegations from "years well beyond the applicable statute of limitations period for maintaining a Title VII claim" fail to apply here. (Defs.' Mem. at 20.) The Court thus declines to dismiss this claim based on the Johnson data.

determinations generally qualify as better suited for litigation phases that fall past the pleading stage. *Woods*, 855 F.3d at 650.

Plaintiff alleges that she and multiple male faculty members in the Department (all of whom presumably would report to the same supervisor, i.e., the Chair) had the same primary responsibilities, (Compl. ¶¶ 98–103), and taught three to four courses per semester, (*id.* ¶ 110), and that courses that her "male comparators [teach] are not more difficult, time consuming, or higher level and they do not have characteristics that would justify more compensation for teaching them," (*id.* ¶ 111). She also notes that, like some of her male colleagues, she serves in various leadership positions within VSU and engages in committee and service work. (*Id.* ¶¶ 113–14.) The Complaint's allegations regarding Department faculty members' primary responsibilities plausibly suggest that these colleagues faced the same standards (another factor for whether jobs qualify as "similar"). *Spencer*, 919 F.3d at 207. The Complaint pleads facts that plausibly give rise to the inference, at the pleading stage, that Plaintiff and at least *some* of her male comparators qualify as similarly situated in all relevant respects. And as noted above, Plaintiff alleges that she suffered adverse actions in the forms of (1) denial of the Department Chair post and (2) pay disparity with these male comparators that arose on the basis of sex.

Accordingly, although Plaintiff's allegations regarding discrete acts that date before November 7, 2020 cannot support her Title VII sex discrimination claim, and while some of her male comparators cannot buttress her Title VII claim, she has presented sufficient factual allegations that raise a right for relief above the speculative level. *Bing*, 959 F.3d at 617. The Court will therefore DENY the Motion to Dismiss as to Count I against VSU.

29

### C.   Counts II and IV – Retaliation in Violation of Title VII and the EPA

In Counts II and IV, Plaintiff forwards claims for retaliation under Title VII and the EPA. To state a claim for retaliation under Title VII, Plaintiff must plausibly allege (1) that she "engaged in a protected activity"; (2) that "the employer acted adversely against" her; and (3) "a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).

In addition, plaintiffs may prove *either* a Title VII retaliation *or* an EPA retaliation claim through (a) "direct evidence of retaliatory animus" or (b) the three-pronged approach outlined above, i.e., the plaintiff engaged in a protected activity and suffered an adverse employment action that had a causal relationship with the protected activity. *Lee v. Belvac Prod. Mach., Inc.*, 2022 WL 4996507, at *2 (4th Cir. Oct. 4, 2022). Accordingly, the Court analyzes Counts II and IV together, because Count II brings a retaliation claim under Title VII and Count IV brings one under the EPA.

As to the protected-activity prong, the Complaint alleges that Plaintiff engaged in protected activity by informing VSU (including Abdullah, Palm and human resources personnel) about the discrimination that she allegedly faced and her unequal pay. (Compl. ¶¶ 157, 172.) Defendants do not clearly contest the Complaint's satisfaction of the protected-activity prong. Plaintiff's protestations to VSU's President, Provost and human resources personnel regarding alleged discrimination and unequal pay constitute protected activity. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (describing "oppositional" actions that count as "protected activity," such as "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities"). Plaintiff thus meets the first prong for bringing retaliation claims.

As to the adverse-action prong in a retaliation claim,[6] "[a]n adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Here, Count II alleges that Defendants retaliated against Plaintiff for complaining about discrimination by:

> denying her an opportunity to serve as Interim Chair for additional pay, forcing her to teach additional courses without extra pay, giving her baseless negative evaluations, pulling resources from programs she developed, verbal harassment, reducing availability of courses taught, refusing to provide advancement opportunities that are afforded to male colleagues, blocking and interfering with her tenure process, coercing her to provide certain student grades and outcomes and denying her a third-year review.

(Compl. ¶ 158.) In addition to these allegations, Count IV contends that VSU retaliated by denying Plaintiff the opportunity to serve as Chair, "denying her a salary increase to the level of comparable men, . . . taking away her responsibilities and job duties [and] giving her unfavorable courses and work assignments." (*Id.* ¶ 174.)

Defendants argue that Plaintiff fails to satisfy the adverse-action prong, contending that any actions that Wellington Gordon took regarding Plaintiff's work assignments do not qualify

---

[6]  The Court observes that in the wake of the Supreme Court's decision in *Muldrow v. City of St. Louis et al.*, No. 22-193, 2024 WL 1642826 (U.S. Apr. 17, 2024), claims brought under Title VII's *discrimination* prong no longer require showing a "significant" change in employment status. However, *Muldrow* reaffirmed that for a *retaliation* claim, a plaintiff must still show that a retaliatory action qualifies as "'materially adverse,' meaning that the action causes 'significant' harm." *Id.* at *6.

as adverse actions. (Defs.' Mem. at 23.)  In Defendants' view, because Plaintiff did not allege that she had a full course load before Wellington Gordon assigned her another course in August 2021, this action cannot plausibly constitute an "adverse action." (*Id.*)  Similarly, Defendants note that the Complaint fails to plausibly allege that Wellington Gordon's decision to name Plaintiff as the Graduate Student Advisor qualified as to her detriment. (*Id.*)

Plaintiff responds that the Complaint alleges that the normal courseload for a faculty member constitutes three to four courses per semester, so any additional course without added pay would qualify as adverse. (Pl.'s Opp. at 21.)  She also argues that while switching her advisees and designating her as Graduate Student Advisor may appear to be trivial actions in isolation, they support a finding of retaliation when evaluated in conjunction with other alleged actions. (*Id.*)  This argument holds some merit, as this Court has found that "rather than considering each alleged adverse employment action in isolation, courts may consider the cumulative effect of several allegedly retaliatory acts . . . and may consider whether based upon the combined effect of alleged events, a reasonable worker could be dissuaded from engaging in protected activity." *Watkins v. Norfolk State University*, 2022 WL 905222 at *4 (E.D. Va., March 28, 2022).

As to Gordon's assignment of a course to Plaintiff in August 2021, Defendants correctly note that the Complaint does not explicitly state whether Plaintiff already had a full course load, but the Complaint *does* allege that Wellington Gordon assigned her "an additional graduate level course . . . only a few days before classes were to begin." (Compl. ¶ 88.)  The Court could reasonably infer at the pleading stage that this allegation means that Plaintiff already had a full courseload, so the question for a retaliation claim becomes whether one additional course constitutes "a significant change in employment status," i.e., a "reassignment with significantly

32

different responsibilities" (given that none of the other types of legally cognizable "significant changes in employment status," such as termination, apply to this conduct). *Hoyle*, 650 F.3d at 337. Based on Plaintiff's typical semester courseload of three to four courses, the Court cannot infer from the Complaint that just one additional course plausibly constitutes a "reassignment with significantly different responsibilities." *Cf. Czekalski v. Peters*, 475 F.3d 360, 364–65 (D.C. Cir. 2007) (holding that plaintiff raised a genuine issue as to whether reassignment that decreased her direct reports from hundreds of employees to fewer than ten and from over fifty programs to just one constituted a "reassignment with significantly different responsibilities").

So too with Plaintiff's assignment as Graduate Student Advisor and new batch of undergraduate advisees, as the Complaint does not allege either of these events led to significantly different responsibilities, especially given that the Complaint otherwise states that "service" qualifies as one of the core responsibilities of faculty members. (Compl. ¶ 98.); *see also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (holding that revocation of an academic professional's mentor status in a graduate program did not qualify as a materially adverse employment action); *Yohannes v. Minnesota IT Servs.*, 2022 WL 2788397, at *9 (D. Minn. July 15, 2022) (finding that the inability to mentor a particular group of subordinates did not materially alter terms of plaintiff's employment).

As discussed *supra* with Count I, Plaintiff cannot recover under Title VII for any actions that Defendants allegedly took before November 7, 2020. Moreover, the statute of limitations for "willful" violations of the FLSA (the umbrella statute of the EPA) constitutes three years, while ordinary violations entail a two-year statute of limitations. 29 U.S.C. § 255(a). Determining what statute of limitations to apply here requires looking at Plaintiff's EPA disparate-treatment claim, i.e., Count III. Plaintiff alleges that "Defendants willfully

discriminated between employees on the basis of sex by paying [her] wages in an amount less

than the wages paid to male comparators." (Compl. ¶ 168.) "Because the question of whether a

defendant's alleged FLSA violations were willful is not an element of [a plaintiff's] claims but

rather an anticipation of a limitations defense that the defendant may raise, [a plaintiff] does not

need to allege specific facts that the defendant willfully violated the FLSA." *Collins v.

Peopleshare, LLC*, 2023 WL 5504984, at *11 (E.D. Va. Mar. 2, 2023). At the pleading stage,

Plaintiff's "allegation that Defendant willfully violated the EPA by intentionally paying her less

than similarly situated male employees" suffices for an EPA claim to qualify for the three-year

statute of limitations that applies to willful violations. *Id.* Here, the Complaint does precisely

that, and further alleges that "Defendants knew, or showed reckless disregard for the fact, that

discriminatory wage payments, as set forth herein, were prohibited by the EPA." (Compl.

¶¶ 168–69.) The Court thus applies a three-year statute of limitations to Plaintiff's EPA claims.

Plaintiff filed her Complaint on November 15, 2023, so she cannot leverage any alleged

acts before November 15, 2020 to support her EPA claims. *See Blount v. Dep't of Health &

Hum. Servs.*, 400 F. Supp. 2d 838, 843 n.7 (D. Md. 2004), *aff'd sub nom. Blount v. Thompson*,

122 F. App'x 64 (4th Cir. 2005) (noting that the filing of an EEO administrative complaint does

not toll the statute of limitations for an EPA civil action). Putting the Title VII cutoff date

(November 7, 2020) and the EPA cutoff date (November 15, 2020) together, the Court

emphasizes that alleged events falling before November 2020 cannot support Plaintiff's

retaliation claims.

Turning to the alleged negative evaluations that Plaintiff contends qualify as adverse

employment actions, the Court observes that the only specific evaluations cited in the Complaint

comprise the ones that Edwards gave to Plaintiff when he served as Department Chair *before*

34

November 2020. *See* (Compl. ¶¶ 40, 45–46) (alleging that Edwards gave Plaintiff negative

evaluations sometime before January 24, 2017 and "[s]oon" after a September 2018 meeting

between Palm and Plaintiff); (*id.* ¶ 63) (stating that Edwards announced in June 2020 that he

would no longer serve as Interim Chair for the upcoming academic year). In responding to

Defendants' statute-of-limitations defense in her opposition brief, Plaintiff does not draw

attention to any timely negative performance evaluations. To be sure, if reprimands are

"signposts on a predetermined path to a true adverse employment action," then Title VII forbids

such conduct. *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015). But

where, as here, "all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the*

*complaint*,'" then the Court may reach the merits of an affirmative defense, such as the statute of

limitations. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). The Court therefore

finds that the Complaint's allegations regarding negative evaluations that Plaintiff received

before November 2020 cannot qualify as "adverse employment actions" to support her Title VII

and EPA claims, because these allegations stand procedurally time-barred.

      The Parties also dispute whether Abdullah's alleged June 2021 statement to Plaintiff that

he would not interact with her and stop mentoring her if she filed a Charge of Discrimination

against VSU qualifies as an adverse action. To Defendants, the Complaint fails to contain facts

supporting a nexus between this alleged conversation and an adverse action. (Defs.' Mem. at 22

n.8.) Plaintiff responds that such a comment from a university president to a faculty member

constitutes a "substantial threat" in the academic profession, even if threatened conduct does not

transpire. (Pl.'s Opp. at 20.) To be sure, courts examining whether "a reasonable employee

would have found the challenged action materially adverse" must keep in mind that "an 'act that

would be immaterial in some situations is material in others." *White*, 548 U.S. at 68–69. And in

applying the "lenient retaliation standard," courts have sometimes found *threats* of retaliation to constitute adverse employment actions. *Hamilton v. Prince George's County, Maryland*, 2019 WL 4735429 at *7 (D. Md. Sept. 27, 2019).

Yet threatening to stop interacting with or mentoring an employee, as Abdullah allegedly did here, lies in a different ballpark than threatening termination. *Cf. Brief-McGurrin v. Cisco Systems, Inc.*, 2019 WL 1332357 at *7 (M.D.N.C. March 25, 2019) (finding that threat of *termination* qualified as adverse action); *E.E.O.C. v. Cognis Corp.*, 2011 WL 6149819 at *7–8 (C.D. Ill. Dec. 12, 2011) (same). Moreover, in general, "courts of appeals have recognized that 'failing to mentor' is not a materially adverse action." *Tankesley v. Vidal*, 2023 WL 4273763, at *24 (E.D. Va. June 29, 2023) (citing *AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014), in which the Eighth Circuit held that a failure to mentor did not establish a prima facie retaliation case "absent materially adverse consequences to the employee").

Mindful of the leniency of the retaliation standard and the plausibility that a threat, in certain circumstances, might dissuade "a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 68, the Court acknowledges that particular contexts may exist in which an academic superior's threat to cut off mentoring could rise to the level of presenting "materially adverse consequences to the employee," *Geithner*, 743 F.3d at 644. But narrowly focusing on the factual allegations here, the Court observes that the Complaint merely alleges that VSU's president told Plaintiff that if she sued for discrimination, "he would have to stop having discussions with her and stop his mentoring process with her." (Compl. ¶ 87.) In addition, the Complaint states that after Plaintiff spoke with Abdullah in June 2021 and filed her Charge of Discrimination with the EEOC in September 2021, VSU named her Assistant Department Chair in April 2023, a post which provided her with a pay bump. (Compl. ¶¶ 19, 87,

109, 128.) Plaintiff therefore clearly did not suffer materially adverse consequences from Abdullah's threatened or actualized lack of mentoring in the months following the alleged conversation. *See Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (explaining that "three to four months" constitutes an overly lengthy delay to establish causality). Examining this narrow, fact-bound context, the Court therefore concludes that without more, Plaintiff cannot rely on Abdullah's June 2021 statement to plausibly allege an adverse employment action.

The Court thus turns to the other factual allegations that Plaintiff seeks to use to buttress her Title VII and EPA retaliation claims. As to "pulling resources from programs" that Plaintiff developed, (Compl. ¶ 158), the Complaint alleges that Edwards tried to remove Plaintiff as internship coordinator sometime in 2017, (*id.* ¶ 42), and that he worked to undermine her internship-related activities when he served as Interim Chair, (*id.* ¶ 48). But all alleged retaliatory actions that occurred before November 2020 fail as procedurally time-barred. Accordingly, Edwards' alleged retaliatory conduct (all of which appears to have predated November 2020) bears no weight here. So too with Edwards' alleged interference with Plaintiff's tenure process. (Compl. ¶¶ 53–65.)

Relatedly, the Complaint does not plausibly allege any causal connection between Plaintiff's protected activity and VSU's alleged actions in "reducing availability of courses taught" or "coercing her to provide certain student grades and outcomes and denying her a third-year review" that occurred within the statute-of-limitations period. (Compl. ¶ 158.)

Plaintiff, however, has one crucial allegation that saves her Title VII and EPA retaliation claims at this stage: VSU's alleged failure to promote her to Chair or Interim Chair. A failure to promote can qualify as an adverse action. *Hoyle*, 650 F.3d at 337. In terms of VSU's alleged

37

failure to promote Plaintiff after she engaged in protected activity, the Complaint alleges that in April 2021, VSU reappointed Wellington Gordon as Interim Chair of the Department, (Compl. ¶ 86), that in March 2022, Crawford became Interim Chair, and that Palm "worked to bring Dr. Crawford to the University and created a position for him following Dr. Robertson's complaints about not being fairly considered for the position of Interim Chair," (*id.* ¶¶ 91, 93).

As to when Palm became aware of Plaintiff's complaints, the Complaint alleges that Plaintiff communicated with him regarding her frustrations with discriminatory practices in 2018, (*id.* ¶¶ 45, 47), and in June 2020, (*id.* ¶ 80). She also alleges that she expressed her interest in the Chair position to Palm in 2018, (*id.* ¶ 44), and April 2019, (*id.* ¶ 50), and that she sent Palm an email in May 2019 that "detailed specific areas of University policy that were not followed in the chair appointment process", (*id.* ¶ 52). The Complaint goes on to allege that Plaintiff wrote a June 2020 email to Palm, in which she "expressed her dissatisfaction with the arbitrary selection and appointment of Mr. Gordon . . . and she explained the pattern and practice of hostility that Dr. Edwards cultivated," particularly toward women. (*Id.* ¶ 80.) Plaintiff further alleges that she emailed Palm again in December 2020 to express her frustration with Wellington Gordon's selection as Interim Chair, but does not mention discrimination-based concerns in this email. (*Id.* ¶ 83.) Lastly and critically for purposes of the causal-connection prong, Plaintiff states that she emailed Palm "[s]oon" after March 16, 2021 to communicate that "she was the only tenured professor with the appropriate credentials and experience who wishes to be Chair and she asked to be appointed Interim Chair, just as had been done previously with Dr. Edwards (a Black man) and Mr. Gordon (a White man)." (*Id.* ¶ 85.)

A Title VII retaliation claim can survive at the motion-to-dismiss stage by pointing to close temporal proximity between the protected activity and an adverse employment action

where defendants possessed knowledge of the protected activity. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). At the same time, the Supreme Court, the Fourth Circuit and this Court have all rejected a *delayed* adverse action as the basis for a retaliation claim. *See id.* (holding that a lack of temporal proximity between the protected activity and retaliatory conduct suggests "no causality at all"); *Pascual*, 193 F. App'x at 233 (explaining that "three to four months" constitutes an overly lengthy delay to establish causality); *Harris v. Wormuth*, 2023 WL 6149071, at *6 (E.D. Va. Sept. 20, 2023) (describing the delay between plaintiff's EEOC complaint and adverse actions as particularly "fatal" to a retaliation claim, when the adverse actions came five months and twenty months after plaintiff filed the EEOC complaint).

Here, the Court cannot draw a plausible causal connection from Plaintiff's communications with Palm in 2018 and June 2020 about discriminatory practices and her failure to receive the Chair position in either April 2021 or March 2022, because those dates fall well after the sphere of temporal proximity that suffices for causality at the pleading stage. *Id.* But Plaintiff *does* allege that she wrote Palm "[s]oon" after March 16, 2021, highlighting her credentials for the Chair, and that in April 2021, VSU nonetheless reappointed a man (Wellington Gordon) to the role instead of her. (*Id.* ¶ 86.) Viewing the facts in the light most favorable to Plaintiff, *Mylan Lab'ys*, 7 F.3d at 1134, the Court concludes that Plaintiff has plausibly alleged that her failure in April 2021 to secure the Chair post possessed a causal connection to her communication "[s]oon" after March 16, 2021 to Palm that she wished "to be appointed Interim Chair, just as had been done previously with Dr. Edwards (a Black man) and Mr. Gordon (a White man)." (*Id.* ¶ 85.) This about-one-month span suffices at the pleading stage. *See Silva v. Bowie State Univ.*, 172 F. App'x 476, 478 (4th Cir. 2006) (holding ten weeks sufficient for plausibly pleading the causation prong of a retaliation claim).

39

While the factual record does not definitively establish at this stage the degree to which Plaintiff's email to Palm after March 16, 2021 explicitly stated her frustrations with discriminatory practices on the basis of sex, the Court refrains from making such factual determinations at the pleading stage. Accordingly, Plaintiff may bring her Title VII and EPA retaliation claims based on the alleged failure-to-promote theory. The Court will therefore DISMISS the Motion to Dismiss as to Counts II and IV.

### D.    Count III—Sex Discrimination Under the EPA

Defendants also dispute whether Plaintiff has plausibly stated a claim for sex discrimination under the EPA. This statute forbids employers from:

> Discriminat[ing] . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1). In a pay disparity case, proving a violation of the EPA entails making an initial showing that (1) a defendant paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs that involved equal skill, effort and responsibility (3) under similar working conditions. *Spencer*, 919 F.3d at 203. The EPA therefore "is a powerful tool, permitting an employee to prevail on a wage discrimination claim with no evidence of intentional discrimination." *Id.* at 207. However, "this tool must be tempered by adherence to its provisions," and [d]oing so requires that the work performed by the plaintiff and her comparators be equal and that the wage disparity not be based on a factor other than sex." *Id.* Indeed, "[s]imilarity of work is not enough; the Act explicitly distinguishes between the work itself (which must be 'equal') and the conditions of work (which need only be 'similar')." *Id.* at

40

204. As a result, Plaintiff "may not rely on broad generalizations at a high level of abstraction" for her EPA claim. *Id.; see also Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994) (comparing Title VII's "relaxed standard of similarity" with the standard for an EPA disparate-treatment claim).

Here, Defendants challenge whether the Complaint satisfies the equal-work prong, arguing that Plaintiff fails to allege facts to support a plausible inference that any male faculty member whom the Complaint identifies qualifies as a proper comparator. (Defs.' Mem. at 21.) In Defendants' view, these male colleagues possess different ranks, specialize in different coursework and hold various administrative roles, and the Complaint does not provide facts to allege that they performed equal work that required equal skill, effort and responsibility. (*Id.*) Moreover, Defendants point to the EPA's two-year statute of limitations as a bar to many of Plaintiff's pay allegations. (*Id.* at 22 n.7.)

The Court first considers Defendants' EPA statute-of-limitations argument. As explained *supra*, the Court applies a three-year statute of limitations to Plaintiff's EPA discrimination claim, and because Plaintiff filed her Complaint on November 15, 2023, she cannot leverage any alleged acts before November 15, 2020 to support Count III. Accordingly, Plaintiff's pay allegations regarding salary data for Byrge, Edward, Wellington Gordon, Jackson, Smith, Curtis Holsopple, Cortez Dial, Ronald Carrington and Ishmail Conway from before November 2020 cannot support her EPA discrimination claim. (Compl. ¶¶ 115–43.) However, Plaintiff presents data from within the three-year window for some of the male comparators, and therefore, as with her Title VII discrimination claim, the statute of limitations does not operate as an absolute bar to Count III. (*Id.*)

41

The Court next considers whether the Complaint plausibly alleges that male comparators performed equal work on jobs that involved equal skill, effort and responsibility. *Spencer*, 919 F.3d at 203. Presenting salary data for various male faculty members who taught in the same Department as Plaintiff does, the Complaint alleges that all the male comparators taught three or four courses (or twelve "semester hours" or more with similar coursework preparation and teaching requirements), along with performing similar scholarship and service responsibilities. (Compl. ¶¶ 98–103, 110–14.)

Admittedly, the Complaint's recitation of Plaintiff's and her male comparators' roles and responsibilities appears somewhat generalized, and *Spencer* instructs that Plaintiff "may not rely on broad generalizations at a high level of abstraction." *Spencer*, 919 F.3d at 203. But two points merit attention here. First, the Fourth Circuit's opinion in *Spencer* concerned a motion for summary judgment, which necessarily constitutes a more demanding standard for a plaintiff than does the pleading stage. *Id.* Second, the faculty comparators in *Spencer* strike the Court as distinguishable. *Spencer* made clear that "[p]rofessors are not interchangeable widgets," as complex factors play into faculty salary decisions and thus lead to reasonable pay differences between, for instance, engineering professors and humanities professors. *Id.* at 202–04. But *Spencer* featured a plaintiff engaging in a "bird's-eye view" comparison between a sociology professor and two male comparators who served as university administrators and professors in *other departments*. *Id.* Here, Plaintiff has done far more than offer a bird's-eye view. Rather, she has identified multiple colleagues in her *same* Department and described the roles and responsibilities of faculty members for this Department (a topic about which she likely knows more than would a sociology professor drawing comparisons with engineering faculty).

42

Indeed, this Court has denied a motion to dismiss an EPA sex discrimination claim where a plaintiff suing a university-employer identified opposite-sex comparators who "teach in the same department" and "work under the same chairperson, and work under [same-duration] contracts" with the same or less teaching experience as the plaintiff. *Earl v. Norfolk State Univ.*, 2014 WL 2916718, at *4 (E.D. Va. June 26, 2014). There, the Court held that even if the plaintiff and the opposite-sex comparators taught courses that did not qualify as the *same* course but which appeared, in the plaintiff's phrasing, "fungible" (i.e., "being of such a nature that one part or quantity may be replaced by another equal part or quantity in the satisfaction of an obligation"), the complaint plausibly alleged that the jobs in question "are '*substantially* equal in skill, effort, and responsibility." *Id.* at *15. So too here. While Defendants emphasize that some of the male comparators whom the Complaint features focus on different coursework, (Defs.' Mem. at 19–21), the Complaint nonetheless alleges that her Department's faculty members all perform substantially the same activities associated with coursework preparation and instruction. (Compl. ¶¶ 98–103.) And as with *Earl*, Plaintiff here includes comparators with the same or less experience. *See* (*id.* ¶¶ 134 (alleging that Plaintiff receives less compensation than does Jackson, despite having more education and experience and a longer duration of service with VSU); 135–38 (alleging that a non-tenured Instructor makes more than Plaintiff).)

Defendants nonetheless raise comparator-specific objections. Pointing to Edwards, a tenured Instructor, Defendants argue that Edwards cannot qualify as a valid comparator, because he served as Interim Department Chair and therefore understandably taught "the same or fewer courses" than Plaintiff did. (Defs.' Mem. at 19.) But the Complaint alleges that in 2021, i.e., when Edwards no longer served as Interim Chair (and in a year that falls within the three-year statute-of-limitations period), he earned more than Plaintiff, even though she served as a tenured

Associate Professor in the same Department that year. (Compl. ¶ 122.) So, while jobs do not qualify as equal "if the more highly paid job involves additional tasks which (1) require extra effort . . . (2) consume a significant amount of the time . . . and (3) are of an economic value commensurate with the pay differential," Edwards' departure from the Interim Chair post placed him on more even footing with Plaintiff for 2021. *Wheatley v. Wicomico Cnty., Maryland*, 390 F.3d 328, 333 (4th Cir. 2004). For that year of salary data, Edwards therefore qualifies as a valid comparator for Count III.

Next, Defendants argue that Byrge fails as a comparator, because he served as a tenure-track Assistant Professor long before Plaintiff jumped on the tenure track. (Defs.' Mem. at 19.) However, the Complaint alleges that even in 2020 (i.e., potentially within the statute-of-limitations period, depending on when VSU made these salary decisions), Byrge earned more than Plaintiff despite the fact that she had tenure by that year. (Compl. ¶ 118.) Byrge therefore does not necessarily fail as a comparator.

Turning to Jackson and Smith, Defendants argue that they focused on different topical coursework and therefore cannot serve as valid comparators. (Defs.' Mem. at 19.) But "fungible" courses in the same Department can still count to survive a motion to dismiss. *Earl*, 2014 WL 2916718, at *15; *see also Reardon v. Herring*, 191 F. Supp. 3d 529, 548 (E.D. Va. 2016) (finding that "[t]he higher level of factual specificity demanded of the plaintiffs" at the summary-judgment stage "is the sort of detail most appropriately developed through discovery").

However, Defendants' argument possesses merit as to certain comparators. Emphasizing that Wellington Gordon taught courses in VSU's Music Department in addition to the Department of Mass Communications and that he served as Interim Chair, Defendants characterize him as an improper comparator. (Defs.' Mem. at 19.) Teaching courses in a

44

different department and serving in an administrative role as Interim Chair strike the Court as precisely the sort of "additional tasks which (1) require extra effort . . . (2) consume a significant amount of the time . . . and (3) are of an economic value commensurate with the pay differential." *Wheatley*, 390 F.3d at 333. The Complaint's concession that he "teaches more courses in the Music Department," (*id.* ¶ 124), means that he cannot serve as a valid comparator for "equal work" pursuant to an EPA sex discrimination claim. So too with Cortez Dial and Ishmail Conway, who held distinct administrative posts and therefore cannot plausibly support Count III as comparators. (Compl. ¶¶ 141, 143.)

In sum, while bound by the Fourth Circuit's guidance in Spencer, the Court finds that "at least at this stage of the proceedings," Plaintiff has sufficiently alleged that at least *some* of her posited male comparators have occupied jobs that "are substantially equal in skill, effort, and responsibility." *Earl*, 2014 WL 2916718, at *15. The Court will therefore DENY the Motion to Dismiss as to Count III.

## IV.    CONCLUSION

For the reasons set forth above, the Court will DENY Defendants' Motion to Dismiss, (ECF No. 22), as to Counts I–IV, but will GRANT the Motion as to terminating all Defendants except Defendant "Virginia State University Board of Visitors," and will GRANT Plaintiff LEAVE TO AMEND the Complaint's caption to restyle Defendant "Virginia State University Board of Visitors" as "The Visitors of Virginia State University."

45

The action will proceed only as to Defendant "The Visitors of Virginia State University," i.e., the proper legal name for VSU.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  April 24, 2024