IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BRIDGETT P. ROBERTSON,
     Plaintiff,

v.                                   Civil No. 3:23cv777 (DJN)

THE VISITORS OF VIRGINIA
STATE UNIVERSITY,
     Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant The Visitors of Virginia State University's ("Defendant") Motion for Summary Judgment. (ECF No. 50.) For the reasons stated herein, the Court will GRANT Defendant's Motion for Summary Judgment, (ECF No. 50), on all four Counts of Plaintiff's Amended Complaint, (ECF No. 33 ("Am. Compl.")).

## I.     BACKGROUND

### A.    Factual Background

Because summary judgment requires an assessment of the undisputed facts, Local Civil Rule 56(B) directs a movant to include an enumerated list of material facts as to which the movant contends that no genuine dispute exists. The nonmovant must then respond by stating whether the fact is disputed or admitted, and if disputed, must provide citations to evidence in the record supporting the claim of a factual dispute. *See* E.D. Va. Loc. Civ. R. 56(B) (requiring that an opposition brief responding to a summary judgment motion "shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute"). When resolving a summary judgment motion, "the Court may assume

that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.*

Here, Defendant complied with Local Rule 56(B). (ECF No. 51 ("MSJ Mem.") at 3–13.) The Court thus endeavors to construe the facts in the light most favorable to Plaintiff as the nonmoving party, including consideration of those facts that Plaintiff appears to dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Viewing the evidence through this lens, the following narrative constitutes the facts for purposes of resolving Defendant's Motion for Summary Judgment.

### 1.    University Organizational Structure, Policies and Administration

Virginia State University ("VSU") constitutes a public university and agency of the Commonwealth of Virginia. (MSJ Mem. ¶ 1.) VSU has seven colleges: the College of Humanities and Social Sciences, the College of Engineering, the College of Agriculture, the College of Natural and Health Sciences, the Reginald F. Lewis College of Business, the College of Education and the College of Graduate Studies. (*Id.* ¶ 3.) Deans lead each college and act as the chiefs of their respective colleges by overseeing their administration. (*Id.* ¶ 8.) The College of Humanities and Social Sciences ("CHSS") has nine departments, one of which includes Mass Communications. (*Id.* ¶ 4.) The Department of Mass Communications (the "Department") boasts a faculty with wide-ranging backgrounds in film, television, broadcast news, audio and music, public relations and print media. (*Id.* ¶ 5.)

The Provost/Vice President for Academic Affairs (the "Provost") constitutes the chief academic officer of VSU. (*Id.* ¶ 6.) Moreover, the Provost assists VSU's President in the administration, coordination and development of instruction, research and curricular activities of the faculty. (*Id.*) The Provost also develops, evaluates and interprets academic policies as well

2

as allocates resources for all academic units.  (*Id.*)  Further, the Provost manages academic

employee relations and reviews and recommends all academic promotions and tenure decisions

to the President.  (*Id.*)  Such promotional duties include appointing the chairperson of each

department, (ECF No. 51-1 at 181),[1] who stands responsible for helping to facilitate the

administration of each respective department.  (MSJ Mem. ¶ 9.)

VSU's Faculty Handbook and Academic Procedures Manual provide the following

guidance for the appointment of a new department chairperson:

> 3.  Prior to initiating search and nomination procedures for a new department chair, the faculty of the department should meet with the Dean of the College to discuss the needs and expectations of the department as they relate to the appointment of a new chair, the chair's role, and the type of search necessary that will most likely assure that an appropriate candidate be recommended, and to discuss any other considerations that bear upon the decision.

> 4.  The faculty of the department will be polled to identify those willing to serve as chair.  If none are willing, the department may have to undertake an external search.

> 5.  If present faculty are willing, the full-time department members on term, probationary, tenured, or continuing contracts will be polled confidentially regarding their preference for chair from among the available candidates. If no candidate wins a majority of the available votes, then the election shall be held again, until one candidate wins a majority.  In the case of more than two candidates, only the top two vote-getters will participate in a second election. The faculty's preference will be forwarded to the Dean.

> 6.  If the Dean does not concur with the department faculty's recommendation, the dean will meet with the department faculty to discuss his/her reasons for disagreement, and the faculty may choose to hold another election or to begin an external search.

> 7.  At any time after the first year of a chair's term, the Provost / Vice President for Academic and Student Affairs, at the request of or in consultation with the Dean and department members, may poll the department as to whether or not they wish the chair to continue to serve.  In the event that a majority oppose the chair's continuing, the Dean, in consultation with the Provost, may begin the reappointment process immediately per steps 3-6.

---

[1]    To avoid confusion, the Court utilizes the pagination system imposed by CM/ECF rather than the various numbering systems that appear on the pages of ECF No. 51-1.

(ECF No. 51-1 at 181–82.)   Moreover, in October 2022, VSU approved a Department Chair Credentials Policy ("the Policy").  (ECF No. 51-1 at 189.)  The Policy provides for the following qualifications for a Department Chair:

> (1) It is preferred that a Chair of each academic department be a tenured faculty member within the college to which the department belongs; (2) The Chair of each academic department must hold a terminal degree in a discipline in the college for which he/she will be the chief academic officer; (3) the Chair of each academic department must have prior college/university teaching experience.

(*Id.*)  Additionally, as to the selection process, the Policy states that "[t]he dean of each college shall organize timely election of chairs from among the eligible faculty members in their respective departments in their respective departments."  (*Id.*)  However, the Policy provides for two exceptions:

> In the event that timely election of a department chair is temporarily not feasible, or a qualified faculty from within the department is not available, one of two nominees of the dean can be voted in as an interim chair and upon the provost's approval to fill the position for a maximum of two consecutive one-year terms.

(*Id.*)

### 2.    VSU's Compensation Structure and Compensation Plan

Because VSU qualifies as a state institution, salaries stand subject to annual appropriations by the General Assembly.  (*Id.* at 81.)  Once funds are appropriated, the Board of Visitors then approves faculty salaries based upon recommendations of the President.  (*Id.*)  More specifically, VSU's Faculty Handbook and Academic Procedures Manual provide the following guidance:

> Salaries shall be reviewed annually and shall be based upon rank and experience.
>
> Salary increases within rank are based on merit/performance.  Specific criteria for salary increases include, among other elements, appropriate degree, educational experience, conscientious and effective teaching,

> research, and professional service, assistance to and support of students, and responsible participation in departmental, College and university activities.
>
> Initial responsibility for assessing merit/performance rests with the department chairperson or immediate supervisor.
>
> These recommendations are subject to review by the dean and the Provost. A final recommendation is made by the Provost to the President.
>
> . . . New faculty salaries should be based upon their proposed rank and previous experience at other institutions of higher education. Every attempt should be made for new faculty to receive a salary that approximates the average of their peers at the rank to which they are hired.

(*Id.*; MSJ Mem. ¶ 13.) Additionally, VSU allows for "overload compensation," which is additional pay for faculty who agree to teach a course load above their requisite level. (ECF No. 51-1 at 82.) However, faculty in departments with low enrollment, and thus fewer advisees, may be required to teach up to three additional credit hours without overload compensation. (*Id.*) Faculty members eligible for overload compensation will be informed of such by the end of the first week of class. (*Id.*)

In 2019, VSU retained a consulting firm to conduct a campus climate survey, salary analysis and compensation study. (MSJ Mem. ¶ 14.) At the end of the process, VSU introduced a new University Compensation Pay Plan, which resulted in salary adjustments for over 150 faculty and staff. (*Id.* ¶ 15.) VSU also adjusted certain job descriptions to further ensure salary fairness. (*Id.*)

Moreover, VSU offers nine-month, eleven-month and twelve-month contracts to its faculty, which VSU issues on an annual basis before the start of the academic year. (*Id.* ¶ 16.) Full-time professors without concurrent academic administrator appointments (e.g., department chairs), summer grants or funded projects receive nine-month contracts, payable in twenty-four bimonthly installments. (*Id.*)

5

### 3.    Plaintiff's Employment History with VSU

Plaintiff served as an adjunct faculty member at Virginia Commonwealth University from 2003 to 2008 before accepting an "Instructor" position in the Department of Language and Literature at VSU.  (*Id*. ¶ 17; ECF No. 53 ("MSJ Opp.") at 10.)  After earning a Ph.D. in May 2015, VSU appointed Plaintiff to a tenure-track position in the Department of Mass Communications at the rank of Assistant Professor for the 2015-2016 academic term.  (MSJ Mem. ¶ 17.)  In August 2019, Plaintiff applied for tenure.  (*Id*.)  In August 2020, VSU awarded Plaintiff tenure and promoted her to the rank of Associate Professor.  (*Id*.)  In addition to these faculty appointments, Plaintiff also served as an Intern Coordinator for the Department.  (MSJ Opp. at 10.)

In the fall of 2022, Plaintiff requested additional leadership opportunities within the Department.  (MSJ Mem. ¶ 18.)  Subsequently, Dean Isis N. Walton ("Dean Walton") discussed with Plaintiff the option of redesigning the Department's website for a $5,000 pay supplement.  (*Id*.; ECF No. 53-1 ("Pl.'s Decl.") ¶ 47.)[2]  This project, however, never came to fruition, and Plaintiff did not receive the pay supplement.  (*Id*.)  Subsequently, Plaintiff requested, and Provost Donald E. Palm, III ("Provost Palm") approved, the creation of an Interim Assistant Department Chair position for the 2023-2024 academic year.  (*Id*. ¶ 19.)  Plaintiff was appointed to the position and received a pay increase as a result.  (*Id*.)  Plaintiff then served in this position for one year before the new Provost, Tia Minnis ("Provost Minnis"), eliminated assistant department chair roles for the 2024-2025 academic year.  (*Id*.)

---

[2]    Plaintiff provides the Court with a 162-page document that contains both Plaintiff's Declaration (pages 2–30) and various exhibits (pages 3–162).  For clarity's sake, the Court will treat ECF No. 53-1 as two.  For Plaintiff's Declaration, the Court will cite to "Pl.'s Decl." with the appropriate paragraph number.  For the subsequent exhibits, the Court will cite to "ECF No. 53-1" with the appropriate page number.

During the relevant period, VSU paid Plaintiff the following salaries: $61,985 for the 2019-2020 academic year; $66,845 for the 2020-2021 and 2021-2022 academic years; $70,187 and $80,000 for the 2022-2023 academic year;[3] $93,333 for the 2023-2024 academic year; and $85,680 for the 2024-2025 academic year. (MSJ Mem. ¶ 20; Opp. at 11.)

In June 2020, VSU appointed Wellington Gordon ("Mr. Gordon") as the Interim Department Chair. (ECF No. 51-2 at 8.) On December 6, 2020, Plaintiff emailed Provost Palm regarding this selection. (*Id.*; MSJ Mem. ¶ 21.) In relevant part, Plaintiff stated that Mr. Gordon's appointment proved "problematic" and "[the] process contravened established university procedure in several ways." (ECF No. 51-2 at 8.) Further, Plaintiff stated that "[a]s I have long stood ready to take on the role of Interim Department Chair to better advance the needs of the Mass Communications Department, I would offer that my appointment to this post would be a best and most appropriate solution." (*Id.* at 9.) Provost Palm shared Plaintiff's concerns with Dean Walton, who spoke with Plaintiff regarding these concerns on January 8, 2021, February 12, 2021 and March 5, 2021. (MSJ Mem. ¶ 21; ECF No. 51-2 at 11.) Moreover, Provost Palm apprised Plaintiff of the Faculty Handbook's procedures regarding departmental chair position changes. (ECF No. 52-1 at 11.) Specifically, Provost Palm informed Plaintiff that college deans would manage "the election process and provide recommendations to [his] office regarding departmental leadership." (*Id.*) Provost Palm also informed Plaintiff that Dean Walton would advise him of when the next election would take place and wished Plaintiff "the best of luck during" that process. (*Id.*)

---

[3]    On February 7, 2023, VSU adjusted Plaintiff's annual salary from $70,187 to $80,000 based on the new University Compensation Plan. (MSJ Mem. ¶ 20 n.5.)

Moreover, during the 2020-2021 and 2021-2022 academic years, Plaintiff and Mr. Gordon exchanged numerous emails regarding the administration of the Department.  (ECF No. 51-3 at 7–20.)  Specifically, these emails reveal disagreements regarding Plaintiff's faculty review, whether Plaintiff's syllabi constitutes her personal intellectual property or VSU's property, Plaintiff's abstention from a departmental vote and Plaintiff's displeasure with her committee assignment from Mr. Gordon.  (*Id.*)

### 4.    Comparator Salaries[4]

In 2002, VSU hired Dr. Carlton Edwards ("Dr. Edwards") as an Assistant Professor. (MSJ Mem. ¶ 25.)  Like Plaintiff, VSU promoted Dr. Edwards to Associate Professor after achieving tenure.  (*Id.*)  Dr. Edwards served as Interim Department Chair from an unspecified time until the spring 2020 semester.  (*Id.*)  During the relevant period, Dr. Edwards's salary was: $73,262 for the 2020-2021 academic year; $68,762 for the 2021-2022 academic year; $72,200 and $80,000 for the 2022-2023 academic year;[5] $84,000 for the 2023-2024 academic year; and $85,680 for the 2024-2025 academic year.  (*Id.*)

Moreover, during the relevant period, VSU paid Eric Jackson ("Jackson"), a non-tenured Assistant Professor, the following salaries:  $61,800 for the 2020-2021 and 2021-2022 academic years; $64,890 for the 2022-2023 academic year; $71,541 for the 2023-2024 academic year; and $72,973 for the 2024-2025 academic year.  (*Id.* ¶ 26.)

---

[4]    The Court notes that Exhibit 10 to Plaintiff's Declaration is a printout of pay data from openpayrolls.com.  (ECF No. 53-1 at 85–92.)  The Court finds that such information constitutes insufficiently reliable evidence to establish what VSU paid its employees.  In fact, the website itself provides a disclaimer of potential inaccuracies.  Thus, the Court considers only documentation issued by VSU to employees detailing their salaries for purposes of establishing comparator salaries.

[5]    On February 7, 2023, VSU adjusted Dr. Edwards's annual salary from $72,200 to $80,000 based on the new University Compensation Plan.  (MSJ Mem. ¶ 25 n.7.)

As to Willis Smith ("Smith"), an Instructor, VSU paid him the following salaries: $65,920 for the 2020-2021 and 2021-2022 academic year; and $69,216 for the 2022-2023 academic year. (*Id.* ¶ 27; MSJ Opp. at 12.)

Finally, during the relevant period, VSU paid Dr. Duane P. Byrge ("Dr. Byrge"), the Academic Coordinator for Film Studies, $68,621 for 2020-2021 academic year. (*Id.* ¶ 28.)

### v.    Academic Administrator Appointment

Provost Palm appointed Mr. Gordon for the 2020-2021 academic year after the previous Department Chair stepped down from the role. (*Id.* ¶ 29.) On June 27, 2021, Provost Palm reappointed Mr. Gordon as interim head of the Department for the 2021-2022 academic term. (*Id.* ¶ 30; ECF No. 51-4 at 1.) Before the end of the academic year, Mr. Gordon informed VSU that he would step down from the Department Chair role. (*Id.* ¶ 31.) As a result, on July 14, 2022, VSU informed Mr. Gordon that his annual contract would not be renewed. (ECF No. 53-1 at 159.) However, VSU requested that Mr. Gordon remain at VSU on a month-to-month basis. (*Id.*) Subsequently, VSU hired Jerry Crawford, Ph.D. ("Associate Dean Crawford") as the Associate Dean of the Department. (MSJ Mem. ¶¶ 31–32.) Provost Palm then appointed Associate Dean Crawford as the Interim Department Chair. (*Id.* ¶ 32.)

### B.    Procedural Background

On November 15, 2023, Plaintiff filed her Complaint, which brought four claims against twenty-two Defendants: Virginia State University, Makola M. Abdullah, Tia A. Minnis, Isis N. Walton, Donald E. Palm, III, Carlton E. Edwards, Virginia State University Board of Visitors, Valerie Brown, Shavonne Gordon, Pamela A. Currey, Victor Branch, Joseph A.F. Chase, Jr., Thomas Cosgrove, Christine Darden, Robert Denton, Jr., Harold Green, Jr., Leonard Haynes, III, Daphne Meeks, Jon Moore, William Murray, William Thota and Edward Owens (collectively,

"Defendants").  Count One alleged that Defendants violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), by discriminating against Plaintiff on the basis of her sex when choosing promotions at VSU.  (ECF No. 1 ¶¶ 150–55.)  Count Two alleged that Defendants violated Title VII, 42 U.S.C. § 2000e-3(a), by retaliating against Plaintiff when she reported Defendants' alleged discrimination.  (*Id.* ¶¶ 156–60.)  Count Three alleged that Defendants violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by discriminating against Plaintiff on the basis of her sex and paying her less than her male counterparts.  (*Id.* ¶¶ 161–70.)  And Count Four alleged that Defendants violated the EPA, 29 U.S.C. § 215(a)(3), by retaliating against Plaintiff for reporting that she was paid less than her male counterparts.  (*Id.* ¶¶ 171–76.)

On February 16, 2024, Defendants filed a Motion to Dismiss Counts One through Four of the Complaint for failure to state a claim.  (ECF No. 22.)  By Memorandum Opinion and Order dated April 24, 2024, the Court denied in part and granted in part Defendants' Motion to Dismiss.  (ECF Nos. 27–28.)  Specifically, the Court granted Defendants' Motion regarding who constituted a proper defendant and dismissed all Defendants except for the Virginia State University Board of Visitors.  (ECF No. 27 at 1.)  Moreover, the Court denied Defendants' Motion as to Counts One through Four.  (*Id.* at 2.)  The Court then directed Plaintiff to file an amended complaint reflecting the Court's Order and restyling "Virginia State University Board of Visitors" as "The Visitors of Virginia State University."  (*Id.* at 1.)

On April 30, 2024, Plaintiff filed her Amended Complaint (ECF No. 33 ("Am. Compl.")), which brings the same four claims as her original Complaint, asserted only against the Visitors of Virginia State University.  (Am. Compl. ¶¶ 150–76.)

Near the close of discovery, the parties jointly filed a motion to continue the trial date.  (ECF No. 47.)  The Court denied this motion as meritless.  (ECF No. 49.)  Defendant then filed

the instant Motion for Summary Judgment ("Motion").  (ECF No. 50.)  On December 10, 2024, Plaintiff responded in opposition to Defendant's Motion.  (ECF No. 53.)  Defendant then replied on December 16, 2024, (ECF No. 54), rendering the Motion ripe for judicial review.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).  The party seeking summary judgment has the burden to identify the parts of the record indicating an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at 324.

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists by going "beyond the pleadings."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party."  *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson*, 477 U.S. 242, 255 (1986)); *see also Lettieri v.*

*Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).  Thus, the Court must assess whether Defendant

has demonstrated that no genuine issue of material fact exists, such that no reasonable jury could

return a verdict for Plaintiff.

### III.    ANALYSIS

Defendant's Motion for Summary Judgment asserts that Plaintiff has failed to "unearth[]

a shred of verified evidence" in support of her Amended Complaint.   (MSJ Mem. at 2.)  The

Court begins by addressing Plaintiff's pay discrimination claim under the EPA (Count Three).

Next, the Court considers Plaintiff's Title VII discrimination claims (Count One).  And finally,

the Court analyzes together Plaintiff's EPA and Title VII retaliation claims (Counts Two and

Four).  For the reasons set forth below, the Court will GRANT Defendant's Motion for Summary

Judgment and DISMISS Counts One through Four of Plaintiff's Amended Complaint.

### A.    Unequal Pay in Violation of the EPA (Count Three)

Plaintiff alleges that VSU paid her male colleagues higher salaries in violation of the

EPA.  (Am. Compl. ¶¶ 161–70; MSJ Opp. at 19–23.)  Defendant disagrees, arguing that Plaintiff

cannot establish a *prima facie* case of pay discrimination.  (MSJ Mem. at 21–24.)   Regardless,

Defendant proffers a non-sex-based explanation for any disparity that Plaintiff cannot rebut.

(*Id.*)  Because Plaintiff fails to establish a *prima facie* case of pay discrimination or rebut

Defendant's affirmative defense, Defendant stands entitled to summary judgment on Plaintiff's

EPA claim (Count Three).

### 1.    Statute of Limitations

The statute of limitations for "willful" violations of the Fair Labor Standards Act

("FLSA"), the umbrella statute of the EPA, constitutes three years, while ordinary violations

entail a two-year statute of limitations.  29 U.S.C. § 255(a).  A willful violation occurs when

employers who "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]" have willfully violated the statute. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Negligent conduct stands insufficient to show willfulness. *Id.* (citing *Richland Shoe*, 486 U.S. at 135). Plaintiff bears the burden to demonstrate that a violation proved willful. *Id.*

Here, Plaintiff argues that "Defendant willfully discriminated between employees on the basis of sex by paying [her] wages in an amount less than the wages paid to male comparators." (Am. Compl. ¶ 168.) By Plaintiff's account, "Defendant knew, or showed reckless disregard for the fact, that discriminatory wage payments . . . were prohibited by the EPA." (*Id.* ¶ 169.) Courts have found that employers willfully violated FLSA where they ignored specific warnings that they were out of compliance, destroyed or withheld records to block investigations into their employment practices or split employees' hours between two companies' books to conceal their overtime work. *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 617 (E.D. Va. 2014) (citing *Herman v. Palo Grp. Foster Home, Inc.,* 183 F.3d 468, 474 (6th Cir. 1999); *Martin v. Deiriggi,* 985 F.2d 129, 136 (4th Cir. 1992); *Cubias v. Casa Furniture & Bedding, LLC*, 2007 WL 150973, at *3 (E.D. Va. Jan. 16, 2007)). The record, however, stands devoid of any factual support that Defendant committed a willful violation of the EPA. Instead, the record shows Defendant took care to ensure that it paid fair salaries.

To this point, Defendant argues that, even if pay disparities existed, its decision to hire a consulting firm to conduct a university-wide salary study demonstrates that any such violation would not qualify as willful. (MSJ Mem. at 18.) Rather, conducting a study evinces a desire to be "proactive and innovative in its efforts to attract and retain a talented, experienced, and

diverse workforce by offering competitive salaries." (*Id.*)  The Court agrees that this evidence undermines Plaintiff's allegation that Defendant willfully violated the EPA.  Plaintiff, however, fails to rebut — let alone respond — to Defendant's argument.

Instead, Plaintiff simply assumes that the Court's determination that Plaintiff sufficiently pled a willful violation of the EPA at the pleading stage — thus rendering Plaintiff's EPA claim subject to the three-year statute of limitations — remains presently applicable.  (MSJ Opp. at 14.)  It does not.  When resolving Defendants' Motion to Dismiss, the Court acknowledged the low standard for pleading a willful violation at the pleading stage, writing that "[b]ecause the question of whether a defendant's alleged FLSA violations were willful is not an element of [a plaintiff's] claims but rather an anticipation of a limitations defense that the defendant may raise, [a plaintiff] does not need to allege specific facts that the defendant willfully violated the FLSA." (ECF No. 28 at 34 (citing *Collins v. Peopleshare, LLC*, 2023 WL 5504984, at \*11 (E.D. Va. Mar. 2, 2023)).  Thus, the Court concluded that merely alleging in her Complaint that "Defendants knew, or showed reckless disregard for the fact, that discriminatory wage payments, as set forth herein, were prohibited by the EPA" satisfied the willful violation standard at the pleading stage.  (ECF No. 28 at 34.)  But at the summary judgment stage, much more is required.  And here, Plaintiff's allegations fall short.

In fact, Plaintiff's only mention of "willful" in her Opposition merely states that some of the alleged comparator salaries were paid within the three-year limitations period, while others — but fewer — were paid during the standard two-year limit.  (MSJ Opp. at 20.)  Plaintiff's Amended Complaint does not assist, as it only states in a conclusory fashion that Defendant willfully engaged in a violation of the EPA.  (Am. Compl. ¶¶ 168–69.)  With no facts to analyze, the Court concludes that Plaintiff fails to meet her burden to establish that Defendant engaged in

a willful violation of the EPA. *Desmond*, 630 F.3d at 358 (citing *Richland Shoe*, 486 U.S. at

135). Plaintiff's EPA claim thus stands subject to a two-year statute of limitations. As a result,

for Plaintiff's EPA claims, the Court will only analyze evidence from after November 15, 2021

— two years before Plaintiff filed her Complaint with this Court. (ECF No. 1.)

### 2. Legal Framework

The EPA prohibits an employer from discriminating on the basis of sex "by paying wages

to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite

sex . . . for equal work on jobs the performance of which requires equal skill, effort, and

responsibility, and which are performed under similar working conditions." 29 U.S.C.

§ 206(d)(1). To establish a *prima facie* case of wage discrimination under the EPA, Plaintiff

must make an initial showing of three elements: "(1) the University paid higher wages to an

employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort,

and responsibility (3) under similar working conditions." *Spencer v. Va. State Univ.*, 919 F.3d

199, 203 (4th Cir. 2019) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). A

disparity is typically shown by a "factor-by-factor" comparison to a specific male comparator.

*Houck v. Va. Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206 (4th Cir. 1993).

Establishing that a plaintiff and comparator engaged in equal work "is a demanding

threshold requirement." *Spencer*, 919 F.3d at 203. "It requires a comparator to have performed

work 'virtually identical' (or the apparent synonym, 'substantially equal') to the plaintiff's in

skill, effort, and responsibility." *Spencer*, 919 F.3d at 203–04 (quoting *Wheatley v. Wicomico

Cty.*, 390 F.3d 328, 332–33 (4th Cir. 2004)). And while "application of the [EPA] is not

restricted to identical work," *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 291 (4th

Cir. 1974), "the jobs involved should be *virtually* identical, that is . . . very much alike or closely

15

related to each other." *Wheatley*, 390 F.3d at 333 (citation omitted). This requires more than a mere showing that Plaintiff and a comparator share a job title. *Wheatley*, 390 F.3d at 332. Instead, "[t]he analysis turns on whether the jobs at issue possess a common core of tasks." *Spencer v. Va. State Univ.*, 2018 WL 627558, at *7 (E.D. Va. Jan. 30, 2018), *aff'd*, 919 F.3d 199 (4th Cir. 2019).

Moreover, a plaintiff "may not rely on broad generalizations at a high level of abstraction" to establish equality between positions. *Spencer*, 919 F.3d at 204. Indeed, "jobs do not automatically involve equal effort or responsibility even if they 'entail most of the same routine duties.'" *Wheatley*, 390 F.3d at 333 (quoting *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 493 (4th Cir. 1972)). "Skill," rather, for purposes of the EPA includes "such factors as experience, training, education, and ability." *Spencer*, 2018 WL 627558, at *7 (quoting 29 C.F.R. § 1620.15(a)). Moreover, even jobs that do share a common core of tasks may be considered unequal if the more highly paid job involves additional tasks requiring extra effort or time or contributes "economic value commensurate with the pay differential." *Hodgson*, 454 F.2d at 493.

If a plaintiff successfully establishes a *prima facie* case of wage discrimination under the EPA, the burden of production and persuasion shifts to the defendant to prove by a preponderance of the evidence that the wage disparity was caused by an enumerated statutory defense. *Brinkley-Obu v. Hughes Training*, 36 F.3d 336, 344 (4th Cir. 1994). These affirmative defenses include: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Should the defendant prove one of these defenses, "the

plaintiff's claim must fail unless plaintiff can satisfactorily rebut the defendant's evidence." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995).

### 3.    Analysis

Even viewing the record in the light most favorable to Plaintiff, she has failed to establish a *prima facie* case under the EPA.  Plaintiff, a tenured Associate Professor in the Department of Mass Communications, asserts that Dr. Edwards, also an Associate Professor in the Department, and Dr. Byrge, the Academic Coordinator for Film Studies, qualify as proper comparators for her EPA claim.[6]  (MSJ Opp. at 20.)  For the reasons set forth below, neither Dr. Edwards nor Dr. Byrge qualifies as a valid comparator for Plaintiff's EPA claim.

As an initial matter, Plaintiff concedes that only Dr. Edwards's salaries can serve as comparator evidence should the Court utilize the two-year statute of limitations.  (*Id.* ("Some of these payments for Drs. Edwards and Byrge are within a three-year look back for willful violations of the EPA (since November 15, 2020) and some of the salary payments for Dr. Edwards are also within the two-year EPA statute (since November 15, 2021).").)  Because the Court has determined that Plaintiff fails to establish that Defendant willfully violated the EPA, the Court applies a two-year statute of limitations.  *See supra* Section III.A.1.  As a result, the Court will perform its "factor-by-factor" comparison only as to Dr. Edwards.  *Houck*, 10 F.3d at 206.

---

[6]    Moreover, Plaintiff concedes that she has "not put forth evidence that [Jackson and Smith] were paid more during the applicable statute of limitations."  (MSJ Opp. at 21 n.4.) Because paying a higher salary constitutes a requirement of the EPA, the Court will not consider Jackson and Smith as comparators for Plaintiff's EPA claims.

Moreover, as this Court previously noted, salary data falls within the statute of limitations period "depending on when VSU made these salary decisions."  (ECF No. 28 at 44.)[7]  Thus, the Court looks to VSU's salary decisions for Dr. Edwards made after November 15, 2021.  Here, the evidence shows that VSU decided Dr. Edwards' 2021-2022 salary on August 10, 2021.  (ECF No. 51-1 at 209.)  As a result, this salary information stands barred by the two-year statute of limitations, because it occurred before November 15, 2021.  The Court therefore considers only Dr. Edwards's 2022-2023, 2023-2024 and 2024-2025 salary data for purposes of comparator evidence.  (*Id.* at 210–12 (showing VSU's salary decisions on April 22, 2022 for the 2022-2023 pay period, July 26, 2023 for the 2023-2024 pay period and May 2, 2024 for the 2024-2025 pay period).)

The first element of an EPA discrimination claim requires that VSU paid higher wages to an employee of the opposite sex.  Dr. Edwards, as a male, constitutes a member of the opposite sex as Plaintiff, a female.  (Am. Compl. ¶¶ 2, 119.)  Here, VSU paid Plaintiff and Dr. Edwards the following salaries:

| Academic Year | Plaintiff's Salary | Dr. Edwards's Salary |
|---|---|---|
| 2022-2023 (Aug.-Feb.) | $70,187 | $72,200 |
| 2022-2023 (Feb.-May)[8] | $80,000 | $80,000 |
| 2023-2024 | $93,333 | $84,000 |
| 2024-2025 | $85,680 | $85,680 |

---

[7]      Even if the Court considered the 2021-2022 data post November 15, 2021, it would not alter the Court's outcome.  This is because Defendant's nondiscriminatory explanation for paying Dr. Edwards a slightly higher salary applies equally to the 2021-2022 academic term as it does the later terms within the limitations period.  *See infra* Section III.A.3.

[8]      During the 2022-2023 academic year, VSU conducted a compensation study that led to an increase in salaries for over 150 faculty and staff, including Plaintiff and Dr. Edwards, as reflected in the above table.  (ECF No. 51-1 at 196, 213.)

(ECF No. 51-1 at 193–96; 210–13.)  Because VSU paid Plaintiff more than Dr. Edwards for the 2023-2024 academic year and an equal amount for both February to May of the 2022-2023 academic year and the entire 2024-2025 academic year, Plaintiff cannot satisfy the first element for her EPA discrimination claim.  Thus, the Court will not factor these time periods into its comparator analysis.  The Court therefore proceeds to analyze prongs two and three only as to the time period from August 2022 to February 2023, during which VSU paid Dr. Edwards an annual salary of $2,013 more than Plaintiff.

The second element for an EPA claim requires that Dr. Edwards "performed equal work on jobs requiring equal skill, effort, and responsibility" to Plaintiff from August 2022 to February 2023.  *Spencer*, 919 F.3d at 203 (citing *Corning Glass Works*, 417 U.S. at 195).  Here, Plaintiff argues that she sufficiently demonstrates that she and Dr. Edwards "performed equal work on jobs requiring equal skill, effort, and responsibility."  (MSJ Opp. at 21.)  Citing to her own declaration, (ECF No. 53-1 at 2–30), Plaintiff asserts that her "education, experience, and credentials meet or exceed those of Dr. Edwards" and that she "performed a greater amount of work (or at least an equal amount) as compared to Dr. Edwards."  (MSJ Opp. at 21.)  Moreover, Plaintiff claims that Dr. Edwards taught fewer courses than she did, failed to serve on as many committees as she did and "did not [] complete as much other service for the Department and University as compared to" her.  (*Id.*)  Plaintiff also asserts that she and Dr. Edwards both qualify as faculty in the Department and "have jobs that require the same skill, effort, and responsibility."  (*Id.* at 22.)  Finally, Plaintiff argues that "her experience is higher (or at least comparable) to Dr. Edwards."  (*Id.*)  After considering Plaintiff's assertions, the Court finds that Plaintiff falls short of the "demanding" standard required to show equality under prong two.

The Fourth Circuit's decision in *Spencer* proves highly instructive on this issue.  919 F.3d 199.  There, the plaintiff relied heavily on the common "professor" title, arguing that "all University professors perform equal work because they all perform the same essential tasks:  preparing syllabi and lessons, instructing students, tracking student progress, managing the classroom, providing feedback, and inputting grades." *Id.* at 204.  The plaintiff asserted that performance of these tasks required the same skills:  "studying, preparing, presenting, discussing, and so forth." *Id.*  But the Fourth Circuit deemed these comparisons insufficient, holding that the "[plaintiff's] generalized claims cannot establish that she engaged in equal work, which categorically dooms her attempt to establish wage discrimination under the Equal Pay Act." *Id.* at 206.

Here, Plaintiff offers similar generalized assertions to establish equality under prong two.  Like the plaintiff in *Spencer*, Plaintiff relies on the fact that she and Dr. Edwards both serve as Associate Professors in the Department.  (MSJ Opp. at 22 ("[Plaintiff] and her male comparator[] have jobs that require the same skill, effort, and responsibility.  Dr. Edwards [is a] faculty member[] in the same Department as [Plaintiff].")  Moreover, just as in *Spencer*, Plaintiff asserts that she and Dr. Edwards stand equal, because both must perform the following tasks:  prepare syllabi, lessons, activities and lectures while tracking student progress, advising students, holding office hours, grading assignments and attending contractually-mandated functions.  (Pl.'s Decl. ¶ 52.)  "But these tasks and skills are shared by middle-school teachers and law-school professors, pre-algebra teachers and biomedical-engineering professors," and thus fail to establish "equality" under the EPA.  *Spencer*, 919 F.3d at 204.

While Plaintiff and Dr. Edwards serve as professors in the same department — unlike the plaintiff and comparators in *Spencer* — this fact does not salvage Plaintiff's claim.  (MSJ Opp. at

21, 22 n.5.)  Rather, without any concrete evidence of the similarities between Plaintiff's and Dr. Edwards's positions, *Spencer*'s wisdom holds true.  This is because "[p]rofessors are not interchangeable like widgets."  *Spencer*, 919 F.3d at 204.  Instead, "[v]arious considerations influence the hiring, promotion, and compensation of different professorial jobs."  *Id.* (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) (discussing the tenure process)).  In sum, a bird's-eye view of equality — like what Plaintiff presents here — stands "particularly unpersuasive given the inherent features of academia."  *Id.*

To be sure, instead of offering evidence, Plaintiff's articulation of equality relies almost entirely on her own declaration, which the Court finds highly unpersuasive at this stage. Specifically, when Plaintiff asserts that her "education, experience, and credentials meet or exceed those of Dr. Edwards," she cites to paragraphs 4–7, 16–19 and 34–35 of her declaration. (MSJ Opp. at 21.)  Upon review, paragraphs 4–7 and 16–19 of Plaintiff's declaration simply highlight Plaintiff's resume, her current role as Associate Professor at VSU, various professional accomplishments and volunteer roles that she fulfills at VSU.  (Pl.'s Decl. ¶¶ 4–7, 16–19.) Paragraphs 34–35 detail what Plaintiff knew of Dr. Edwards's role.  (*Id.* ¶¶ 34–35.)  But even Plaintiff's declaration reveals the limits of her personal knowledge.  While Dr. Edwards's 2020-2021 appointment letter includes an appointment as Director of Media and Broadcast Services (ECF No. 51-1 at 208), Plaintiff states that "[a]lthough [she] worked closely with Dr. Edwards at this time, [she] was not aware he held this title and it was not apparent to [her] that he had any significant extra responsibilities in connection with the title."  (Pl.'s Decl. ¶ 34.)  Plaintiff's personal observations of Dr. Edwards's positions, however, stand wholly inadequate to establish equality under the EPA's "demanding" standard.  *Spencer*, 919 F.3d at 203.  Rather, her observations simply inform the Court of her subjective view.  But at summary judgment, absent

objective corroboration, "a party's self-serving opinion cannot . . . defeat summary judgment." *Miller v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 64 F.4th 569, 576 (4th Cir. 2023).

Plaintiff proceeds to discuss how VSU once referred to Dr. Edwards as an "Assistant Professor" in an internal publication and on their website in an apparent effort to prove her superior qualifications to Dr. Edwards. (*Id.* ¶¶ 34–35.) And while Plaintiff provides objective corroboration to these assertions, (ECF No. 53-1 at 62–83), her argument nonetheless proves unavailing for two reasons. First, Plaintiff's evidence that VSU referred to Dr. Edwards as an Assistant Professor — a lower rank than an Associate Professor — appears, to the best of the Court's knowledge, to come from before the 2017-2018 academic year. (ECF No. 53-1 at 79 (noting the date of the publication only when stating that "[c]atalog amendments for the 2017-2018 are planned and will be provided as soon as possible"). This period falls well before the November 15, 2021 statute of limitations for Plaintiff's EPA claims, and thus stands irrelevant to the Court's considerations. Moreover, Plaintiff's copy of the Department's website is from July 9, 2020, which again falls outside of the statute of limitations. (*Id.* at 82; Pl.'s Decl. ¶ 37.) As a result, the Court finds that Plaintiff fails to satisfy prong two, thus dooming her EPA claim.

Furthermore, Plaintiff fails to establish prong three for the same reasons as prong two. The third element of an EPA claim requires that Plaintiff show that she and Dr. Edwards performed work "under similar working conditions." *Spencer*, 919 F.3d at 203 (citing *Corning Glass Works*, 417 U.S. at 195). Again, Plaintiff offers only her self-serving declaration in support of her argument that she and Dr. Edwards worked under similar conditions. (MSJ Opp. at 22.) Specifically, Plaintiff's declaration states that "[a]ll faculty members in the Department, male and female, performed their work under similar conditions, most often working in the same building or using the same means of communication." (Pl.'s Decl. ¶ 55.) Additionally, Plaintiff

states that "[t]he Department is a fairly uniform workplace" for faculty.  (*Id.* ¶ 56.)  Plaintiff

further declares that "[a]ll faculty members in the Department (including Dr. Edwards . . . and

[Plaintiff]) deal with the same supervisors, namely the Chair or Interim Chair of the Department,

Dean, Provost and President."  (*Id.*)  Finally, Plaintiff states that "[t]he same standards and

guidelines [apply] to all faculty members in the Department and [faculty] work towards the same

common goal of educating students."  (*Id.*)  But the Court cannot accept Plaintiff's own

subjective evidence to establish this prong.  Rather, the Court requires objective corroboration

for Plaintiff to meet this burden.  *See Miller*, 64 F.4th at 576 (noting that absent objective

corroboration, "a party's self-serving opinion cannot . . . defeat summary judgment").

   In sum, Plaintiff's broad generalizations fail to establish that from August 2022 to

February 2023, she and Dr. Edwards performed equal work under similar conditions.  This, of

course, is not to say that a plaintiff in higher education could not successfully bring an EPA

claim.  *Spencer,* 919 F.3d at 205.  But in this context — "one where the work is an exercise in

intellectual creativity that can be judged only according to intricate, field-specific, and often

subjective criteria" — broad generalities will not do.  *Id.*  Rather, Plaintiff needed to present

evidence upon which a jury could rely to decide that she and Dr. Edwards maintained equal

positions, not just that they vaguely performed the same tasks and were subject to the same

standards.  *See id.* ("That is, there must be evidence showing the jobs were equal in the strict

sense of involving 'virtually identical' work, skill, effort, and responsibility, not in the loose

sense of having some comparative value.") (citing *Wheatley*, 390 F.3d at 333).  Such evidence

may include, but is certainly not limited to, syllabi for courses taught, a course catalog for the

relevant semester(s), depositions from the parties and colleagues who hold the positions at issue

and depositions from the Department's leadership, none of which Plaintiff provides.[9]  Instead, Plaintiff supplies the Court with a smattering of exhibits and a self-serving declaration upon which no definitive conclusions can be made.  (ECF No. 53-1 at 31–162.)  Thus, Plaintiff fails to make out a *prima facie* case of pay discrimination under the EPA.

 Moreover, even if Plaintiff could meet her initial burden, her claim would still fail because VSU established that the salary difference was based upon a "factor other than sex."  29 U.S.C. § 206(d)(1)(iv).  Specifically, Defendant asserts that Dr. Edwards has been employed by VSU for longer than Plaintiff, was tenured before Plaintiff and had recently completed his service as the Interim Department Chair.  (MSJ Mem. at 23–24.)  These assertions stand corroborated by record evidence, including Plaintiff's own exhibits and assertions.  (ECF No. 53-1 at 67, 75 (marking Dr. Edwards's employment date at VSU beginning in 2002, while Plaintiff's began in 2008); ECF No. 51-1 at 208–12 (noting Dr. Edwards's 2020-2021 appointment as Associate Professor and Director of Media and Broadcast Services); MSJ Opp. at 4 (Plaintiff acknowledging Dr. Edwards as the Chair of the Department in August 2019); Pl.'s Decl. ¶ 7 (stating that Dr. Edwards served as Department Chair before Interim Department Chair Gordon's appointment); ECF No. 51-1 at 208 (showing Dr. Edwards as "tenured" before August

---

[9] The Court acknowledges that Exhibit 11 to Plaintiff's declaration provides the course catalog for the Spring and Fall 2021 semesters.  (ECF No. 53-1 at 93–94.)  But this exhibit fails to assist Plaintiff, because these semesters stand time-barred as the courses occurred — or the decisions regarding these courses were made — before the November 15, 2021 statute of limitations.  Moreover, even if the Court were to consider the Fall 2021 course catalog in its analysis, it would actually undermine Plaintiff's case, because during that semester, Dr. Edwards taught fifteen credit hours, while Plaintiff taught only twelve credit hours.  (*Id.*)  Thus, pursuant to VSU's Faculty Handbook & Academic Procedures Manual, Dr. Edwards would have qualified for overload compensation, which constitutes a "a non-sex-based explanation for the pay disparity."  *Spencer*, 919 F.3d at 206; *see* ECF No. 51-1 at 82 (defining overload compensation as available to those "teaching additional courses beyond the normal twelve credit hours per semester.")

18, 2020); Am. Compl. ¶ 65 (stating that Plaintiff was notified that she earned tenure on August 23, 2020).)[10]

Additionally, even Plaintiff acknowledges that VSU policy states that "faculty salaries are to be based only on rank and experience." (MSJ Opp. at 22.) Thus, considering that between August 2022 and February 2023, Dr. Edwards had been employed by VSU and tenured longer than Plaintiff, as well as held leadership positions that Plaintiff had not, it follows that Dr. Edwards' rank and experience would be greater than Plaintiff's and thus warrant a higher salary. *See Earl v. Norfolk State Univ.*, 2016 WL 1078280, at *7 (E.D. Va. Mar. 17, 2016) (noting that when a former academic administrator returns to a faculty position, elevated pay is "not uncommon" and proves to be a "generally accepted practice in higher education").

In fact, VSU's Faculty Handbook and Academic Procedures Manual states that when department chairs return to faculty positions, they will receive "nine/twelfths" of their administrator salary. (ECF No. 51-1 at 86.) The Fourth Circuit has deemed this exact policy "a non-sex-based explanation for [a] pay disparity." *Spencer*, 919 F.3d at 206 (4th Cir. 2019); *see also Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (noting that "[a]dministrators are paid higher wages," and "faculty members retain this increase in salary when they return to teaching, thus inflating [some] faculty salaries"). In response, Plaintiff fails to offer any argument to rebut Defendant's explanation. Thus, because "rank and experience" qualifies as "a non-sex-based explanation for the pay disparity," Defendant would nevertheless defeat Plaintiff's *prima facie* EPA case, had she made one out. *Spencer*, 919 F.3d at 206.

---

[10]    The Court notes that neither party provides the exact date that Dr. Edwards received tenure. That said, Defendant asserts — and Plaintiff does not contest — that is was before Plaintiff received tenure, thus the Court treats this fact as admitted. (MSJ Mem. at 23.)

In sum, Plaintiff has failed to establish a *prima facie* case of pay discrimination in violation of the EPA.  And, even if she had, Defendant proffered a non-sex-based explanation for the disparity, which Plaintiff fails to rebut.  Thus, no genuine issue of material fact exists, and Defendant stands entitled to summary judgment on Count Three.

**B.      Sex Discrimination in Violation of Title VII (Count One)**

Plaintiff alleges that VSU engaged in the following discrimination, because of her sex, in violation of Title VII:  (1) VSU failed to pay her a salary equal to her male counterparts; (2) VSU withheld overload compensation from her while paying it to her male colleagues; and (3) VSU failed to select her as Chair or Interim Chair of the Department.  (Am. Compl. ¶¶ 150–55; MSJ Opp. at 14–19.)  Defendant disagrees, arguing that Plaintiff cannot establish a *prima facie* case of sex discrimination.  (MSJ Mem. at 26–28.)  Regardless, Defendant asserts that it possessed legitimate, non-discriminatory reasons for promotional decisions and any pay differential between Plaintiff and her comparators.  (*Id.* at 28–30.)  Because Plaintiff fails to establish a *prima facie* case of discrimination or prove that Defendant's nondiscriminatory explanation constitutes pretext, Defendant stands entitled to summary judgment on Plaintiff's Title VII discrimination claim (Count One).

**1.      Statute of Limitations**

As an initial matter, the Court previously held that, because Plaintiff filed her Charge of Discrimination with the EEOC on September 3, 2021, she cannot recover under Title VII for discrete discriminatory acts that allegedly occurred before November 7, 2020.  (ECF No. 28 at 25); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102, 110–14 (2002) (holding that only acts that occurred within 300 days of the filing of an employment discrimination charge with the appropriate administrative agency qualify as actionable, as 42 U.S.C. § 2000e–5(e)(1)

provides for a 300-day filing timeline). Here, the parties agree with the Court's conclusion. (MSJ Mem. at 27; MSJ Opp. at 14.) Thus, the Court considers only those alleged actions that occurred after November 7, 2020 for purposes of Plaintiff's Title VII claims.

### 2.    Legal Framework

Title VII makes it unlawful for an employer "to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 USC § 2000e–2(a)(1). Plaintiffs possess two avenues to establish liability under Title VII:  (1) "demonstrate through direct or circumstantial evidence that [gender] was a motivating factor in the employer's adverse employment action;" or (2) use the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017). A *prima facie* case under *McDonnell Douglas* requires Plaintiff to establish that "(1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." *Spencer*, 919 F.3d at 207 (citing *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). And when a plaintiff's allegations are based "completely upon a comparison to an employee from a non-protected class . . . the validity of [the plaintiff's] *prima facie* case depends upon whether that comparator is indeed similarly situated." *Thomas v. City of Annapolis*, 851 F. App'x 341, 347 (4th Cir. 2021).

Proving that a plaintiff and comparator are "similar" under Title VII constitutes a lower burden than the EPA's "equal" requirement. *Spencer*, 919 F.3d at 207. In determining similarity, courts consider the following:  "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor,

27

and (iv) had comparable experience, education, and other qualifications — provided the employer considered these latter factors in making the personnel decision." *Id.* (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)).  Moreover, a comparator "must have been treated more favorably than the [p]laintiff with respect to the adverse action complained of." *Wilson v. City of Chesapeake*, 290 F. Supp. 3d 444, 458 (E.D. Va. 2017), *aff'd*, 738 F. App'x 169 (4th Cir. 2018) (citing *Haywood*, 387 F. App'x at 359).  And while the Title VII standard may be less demanding than the EPA's, plaintiffs must nevertheless "provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all respects.*'"  *Spencer*, 919 F.3d at 207–08 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Once a plaintiff establishes a *prima facie* case, defendants then bear the burden "to proffer a legitimate, nondiscriminatory explanation for the [adverse action]."  *Id.* at 208; *see also Earl*, 2016 WL 1078280, at *4 (noting that "in contrast to the EPA, for a Title VII claim, a *prima facie* showing serves to shift only the burden of production to the defendant to advance a non-discriminatory justification for its acts").  If a defendant proffers a nondiscriminatory explanation for the decision, the burden then shifts back to the plaintiff "to prove that the explanation is merely pretextual for invidious discrimination."  *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) (requiring evidence that would allow a factfinder to believe her "explanation of intentional discrimination").

3.      **Analysis**

a.      **Salary Disparity**

As discussed above, the Court will only consider pay data issued after November 7, 2020.

*See supra* Section III.B.1.  Thus, the Court will analyze alleged comparator salaries beginning

with the 2021-2022 academic year.

To that end, Plaintiff asserts that she has established that VSU paid both Dr. Edwards and

Dr. Byrge more than her.[11]  (MSJ Opp. at 16.)  As an initial matter, Dr. Byrge fails to constitute a

valid comparator, because, as Plaintiff asserts, he departed VSU after the 2020-2021 academic

year.  (*Id.* at 20.)  And because VSU issued his 2020-2021 salary data on June 18, 2020, months

before the November 7, 2020 statute of limitations, the Court will not consider his 2020-2021

salary in its comparator analysis.[12]  The Court will, however, consider Dr. Edwards's salaries

---

[11]      As with the EPA, a Title VII claim requires that a "plaintiff must show that she is paid
less than men in similar jobs."  *Spencer*, 919 F.3d at 207.  Thus, because Plaintiff concedes that
she was paid more than Jackson and Smith during the applicable statute of limitations, the Court
will not consider Jackson or Smith as comparators for purposes of Plaintiff's Title VII claims.
(MSJ Opp. at 21 n.4.)

[12]      Even if the Court were to consider Dr. Byrge's 2020-2021 salary after November 7, 2020
for the remainder of the 2020-2021 academic year, the Court would nevertheless find that he
fails to constitute a proper comparator.  Dr. Byrge was the Academic Coordinator for Film
Studies during the 2020-2021 academic year, which stands in contrast to Plaintiff's role as
Associate Professor in the Department.  (ECF No. 51-1 at 191, 222.)  Plaintiff "disputes that Dr.
[] Byrge's title was Academic Coordinator for Film Studies because he was held out to be a
professor," but the Court follows the record evidence, not Plaintiff's baseless assertions.  (MSJ
Opp. at 12.)  Moreover, even Dr. Byrge's and Plaintiff's appointment letters reveal the
fundamental differences in their appointments.  While Plaintiff's letter states that her "duties and
responsibilities will be defined [] by the Chairperson of [her] Department and approved by the
Dean of [her] College and the Provost," Dr. Byrge's letter states that his "duties and
responsibilities will be defined by the President or his/her designee."  (ECF No. 51-1 at 191,
222.)  Thus, because Plaintiff's and Dr. Byrge's titles and supervisors proved different for the
2020-2021 academic year, the Court finds that their positions fail to qualify as "similar" for
purposes of Title VII comparator analysis.  *Spencer*, 919 F.3d at 207.

from the 2021-2022 academic year and onward.  Specifically, VSU paid Dr. Edwards and

Plaintiff the following salaries:

| Academic Year | Plaintiff's Salary | Dr. Edwards's Salary |
|---|---|---|
| 2021-2022 | $66,845 | $68,762 |
| 2022-2023 (Aug.-Feb.) | $70,187 | $72,200 |
| 2022-2023 (Feb.-May) | $80,000 | $80,000 |
| 2023-2024 | $93,333 | $84,000 |
| 2024-2025 | $85,680 | $85,680 |

(ECF No. 51-1 at 192–96; 209–13.)

Assuming without deciding that Plaintiff has established a *prima facie* case of Title VII

wage discrimination, her case still fails at summary judgment.  This is because, as established

above, Defendant has proffered numerous nondiscriminatory explanations for the pay disparity

between Plaintiff and her alleged comparator.  *See supra* Section III.A.3.  Just as Defendant's

practice of paying salaries according to "rank and experience" satisfies the EPA's "factor other

than sex" affirmative defense, it also qualifies as "a legitimate, nondiscriminatory explanation

under Title VII."  *Spencer*, 919 F.3d at 208 (citing *Cnty. of Washington v. Gunther*, 452 U.S.

161, 169 (1981) (recognizing that the Bennett Amendment to Title VII incorporates the four

affirmative defenses from the EPA).)[13]

Moreover, Plaintiff offers no argument whatsoever to establish that Defendant's

proffered explanation constitutes a pretext for discrimination.  Instead, Plaintiff asserts that she

has established that her rank actually exceeded that of Dr. Edwards.  (MSJ Opp. at 22.)  Her

supporting evidence for this assertion, as discussed above, is both untimely and insufficient.  *See*

---

[13]    The Court's EPA affirmative defense analysis applies to its Title VII analysis,
notwithstanding the fact that the Title VII statute of limitations starts on November 7, 2020,
while the statute of limitations for Plaintiff's EPA claim starts November 15, 2021.  This is
because, during the 2021-2022 academic year — which is included in the Court's Title VII
analysis, but not in its EPA analysis — Dr. Edwards's rank and experience remained higher than
Plaintiff's.

*supra* Section III.A.3.  First, Plaintiff argues that, because an internal VSU publication and the

VSU website once referred to Dr. Edwards as an "Assistant Professor," Plaintiff possessed a

greater rank than Dr. Edwards.  (*Id.* ¶¶ 34–35, 37.)  But the internal publication is from before

the 2017-2018 academic year while the website archive is dated for July 9, 2020.  (ECF No. 53-1

at 62–82.)  Both periods fall before the November 7, 2020 statute of limitations, therefore

standing untimely.  Moreover, Plaintiff's evidence contradicts her own Amended Complaint,

which states that Dr. Edwards "was Interim Chair of the Department [] from about 2016 to

2020."  (Am. Compl. ¶ 9.)  Thus, even if the internal publication and website archive prove

correct, it is undisputed that the Chair of the Department constitutes a position of higher rank and

leadership than that of a faculty member within the Department — indeed, the lion share of

Plaintiff's suit revolves around that exact fact.  As a result, Plaintiff's assertion that her rank

exceeded that of Dr. Edwards proves unavailing.  As a result, Plaintiff fails to prove that

Defendant's nondiscriminatory explanation for a pay disparity constitutes pretext for illegal

discrimination.

### b. Overload Compensation

Plaintiff's allegation that VSU engaged in discrimination when it paid — or failed to pay

— overload compensation also qualifies as meritless.  Specifically, Plaintiff asserts that, in

August 2021, Mr. Gordon "forced [her] to take on an additional graduate level course, Media

Research methods . . . without any overload compensation or additional pay."  (Pl.'s Decl. ¶ 124;

MSJ Opp. at 17.)  Moreover, Plaintiff argues that VSU denied her overload compensation for

"her work as Internship Coordinator from November 2020 to the present."  (MSJ Opp. at 17.)

Defendant disagrees, arguing that Dr. Edwards, unlike Plaintiff, taught an additional course and

thus qualified for overload compensation.  (ECF No. 54 ("Reply") at 19.)

As an initial matter, it is undisputed that VSU's Faculty Handbook and Academic Procedures Manual provides that overload compensation is available to faculty who teach "additional courses beyond the normal twelve credit hours per semester." (ECF No. 51-1 at 82.) Thus, VSU's failure to pay Plaintiff overload compensation for serving as an internship coordinator — which she fails to proffer qualifies as an "additional course" that placed her course load beyond twelve credit hours — cannot constitute an adverse employment action, because Plaintiff submits no evidence proving that she stood entitled to overload compensation for such responsibilities. *See Smith v. Virginia Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 510 (E.D. Va. 2020) (finding that the denial of a discretionary bonus did not constitute an adverse employment action). Moreover, the record evidence contradicts Plaintiff's statement that she qualified for overload compensation for the Fall 2021 semester. (ECF No. 53-1 at 93.) Specifically, the course catalog — Exhibit 11 to Plaintiff's own declaration — reveals that Plaintiff taught four three-credit courses, for a total of twelve credit hours, while Dr. Edwards taught five three-credit courses, for a total of fifteen credit hours. (*Id.*) Thus, Dr. Edwards, *not* Plaintiff, stood eligible for overload compensation for that semester. As a result, no discrimination occurred, and Plaintiff therefore fails to establish a *prima facie* case of sex discrimination arising from VSU's payment of overload compensation to Dr. Edwards.

### c.    Interim Department Chair

Additionally, Plaintiff alleges that VSU discriminated against her on the basis of sex when it failed to appoint her as Interim Department Chair for the 2021-2022 and 2022-2023 academic years. (MSJ Opp. at 17.) Plaintiff qualifies as a member of a protected class based on her sex. (Am. Compl. ¶ 2.) Moreover, "failing to promote" an employee constitutes an adverse employment action. *Thomas*, 851 F. App'x at 345. Thus, the Court must determine whether

Plaintiff has established elements two (satisfactory job performance) and four (circumstances suggesting an unlawful discriminatory motive). Assuming without deciding that Plaintiff meets prong two, she nevertheless fails to demonstrate circumstances suggesting an unlawful discriminatory motive.

Plaintiff alleges that Dr. Palm's reappointment of Mr. Gordon and appointment of Dr. Crawford to the Interim Department Chair position constitute evidence of discrimination against her, because these candidates were "lesser-qualified male professors" and their appointments contravened Department policy. (MSJ Opp. at 16–18.) These claims each fail.

First, Plaintiff fails to provide adequate evidence or argument establishing herself as the higher-qualified candidate. Plaintiff's declaration states that she "was required to have tenure before [she] could be Chair or Interim Chair." (Pl.'s Decl. ¶ 78.) But Plaintiff does not substantiate this claim with objective evidence. Thus, the Court disregards this statement as irrelevant. *See Nobrega v. Piedmont Airlines, Inc.*, 2021 WL 1895892, at *7 (E.D. Va. May 11, 2021) (citing *Evans*, 80 F.3d at 962) ("The Court must 'generally consider self-serving opinions without objective corroboration not significantly probative,' such that a plaintiff's uncorroborated opinions and statements may be disregarded as irrelevant.")

Moreover, Dr. Palm, VSU's Provost and the person with authority to appoint the Department Chair during the relevant period, stated in his sworn declaration that he believed that Plaintiff lacked the leadership skills to serve as Department Chair. (ECF No. 51-2 ¶ 19.) He further stated that Plaintiff also lacked flexibility, a quality that he believed to be "absolutely necessary given the challenges of the position, especially during the COVID-19 pandemic." (*Id.*) Here, Plaintiff fails to address Dr. Palm's evaluation of her qualifications. Even still, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."

33

*Evans*, 80 F.3d at 960–61. Thus, Plaintiff's subjective claim of superior qualifications possesses no credence. This is especially true given that Plaintiff's assertions stand entirely conclusory and without evidence that the failure to promote her was motivated by discrimination. *See Vaughan v. MetraHealth Cos., Inc.,* 145 F.3d 197, 202 (4th Cir. 1998) (*citing Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 959 (5th Cir.1993)) ("Standing alone, self-serving claims of superiority do not suffice."); *Evans,* 80 F.3d at 960 (summary judgment granted to defendant in sex discrimination case affirmed, because plaintiff "failed to show that she was more qualified for the promotion than the man selected or that, as between her sex and [the proffered] explanation, her sex was the more likely reason for her failure to be promoted").

Moreover, Plaintiff's allegation of discrimination arising from Defendant's failure to follow departmental policies also lacks merit. Specifically, Plaintiff argues that Dr. Palm's reappointment of Mr. Gordon in April 2021 and the appointment and reappointment of Dr. Crawford in May 2022 and June 2023 without a faculty vote contravened VSU policy. (MSJ Opp. at 18.) At issue is the Policy, which the parties do not dispute VSU formally adopted in October 2022. (MSJ Opp. at 18; MSJ Mem. ¶ 9.) Thus, only the reappointment of Dr. Crawford in June 2023 stood subject to the Policy.

Upon review of the Policy, the Court finds that Plaintiff failed to establish that Dr. Palm's reappointment of Dr. Crawford to Interim Department Chair without a faculty vote constituted a violation. The policy provides that college deans "shall organize timely elections of chairs amongst eligible faculty members in their respective departments." (ECF No. 53-1 at 102.) However, should a timely election be infeasible or there exist no qualified faculty, "one or two nominees of the dean can be voted in as an interim chair and upon the provost's approval to fill the position for a maximum of two consecutive one-year terms." (*Id.*) Even viewing the

34

evidence in the light most favorable to Plaintiff, she fails to demonstrate that a timely election proved feasible. Thus, the Court cannot determine whether failing to conduct a faculty election for the reappointment of Dr. Crawford to a one-year term constituted a violation of the Policy.

Furthermore, Plaintiff endeavors to prove that the earlier Interim Department Chair appointments were conducted in violation of Provost Palm's "established [] policy (or 'unofficial position') that future chair appointments would be by election." (MSJ Opp. at 18.) Here, Plaintiff refers to a March 16, 2021 email written to Plaintiff in which Provost Palm states that, "[p]er the Faculty Handbook, it is my official position that changes in the Chair leadership will occur via a departmental vote. I have also requested that all Deans manage the election process and provide recommendations to my office regarding changes in departmental leadership. This includes temporary appointments of Interim Chair." (ECF No. 53-1 at 101.) While this is supported by the Faculty Handbook, the Handbook also states that "Department chairs . . . will be appointed by the Provost." (ECF No. 51-1 at 181.) The Handbook further notes that a department dean, who recommends a candidate to the Provost, is not bound by the faculty's recommendation for a new chair, despite the policy also calling for an election. (*Id.* at 181–82.) Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the failure to conduct faculty elections ahead of the reappointment of Mr. Gordon in April 2021 and Dr. Crawford in May 2022 could have violated departmental policy.

That said, selection of a candidate in violation of company policy does not implicate Title VII unless Plaintiff presents evidence that Defendant implemented the policy differently based on a prohibited classification, such as gender. *Obi v. Anne Arundel Cnty., Md.*, 28 F. App'x 333, 336 (4th Cir. 2002). Here, Plaintiff presents only conclusory allegations that, because she has demonstrated a deviation from policy, she has thus established that "VSU purposely and

intentionally discriminated against [her] based on her sex." (MSJ Opp. at 18.) But under Fourth Circuit precedent, such conclusory allegations fail at the summary judgment stage. *See, e.g.*, *Vaughan*, 145 F.3d at 203 ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent . . . Federal courts cannot ensure that business decisions are always informed or even methodical.") As a result, Plaintiff has failed to make out a *prima facie* case of Title VII discrimination.

But even if Plaintiff had successfully established a *prima facie* case, her claims would nonetheless fail, because she has not established that Defendant's legitimate, nondiscriminatory explanation for not appointing Plaintiff as Interim Department Chair constituted pretext for discrimination. Specifically, Defendant asserts that the record is "clear" that Provost Palm reappointed Mr. Gordon for the 2021-2022 academic year, because he successfully carried out his duties for the previous academic term. (MSJ Mem. at 28.) Moreover, Defendant claims that Provost Palm appointed Dr. Crawford as Interim Department Chair for the 2022-2023 academic year, because of his expertise in shared governance, "which aligned with Provost Palm's vision for the Department." (*Id.*) Additionally, as discussed above, Provost Palm stated that Plaintiff lacked "the leadership skills" for the position and believed Plaintiff to be inflexible, a quality he found to be "absolutely necessary given the challenges of the position, especially during the COVID-19 pandemic." (ECF No. 51-2 ¶ 19.) Altogether, these explanations constitute ample nondiscriminatory explanations for Provost Palm's selection of Mr. Gordon and Dr. Crawford for Interim Department Chair.

To defeat these nondiscriminatory explanations, Plaintiff must demonstrate that such explanations constitute pretext for illegal discrimination. Here, Plaintiff fails to do so. In fact,

she raises no argument at all that Plaintiff's proffered explanations constitute pretext.  Instead, Plaintiff simply enumerates conclusory allegations that not selecting her for the position constitutes sex discrimination.  (MSJ Opp. at 17–18; Pl. Decl. ¶ 104–05); *see Dockins v. Benchmark Comms.,* 176 F.3d 745, 749 (4th Cir. 1999) (noting that a plaintiff's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons").  As a result, Plaintiff cannot overcome Defendant's legitimate, nondiscriminatory explanation for not appointing her as Interim Department Chair.

In sum, even if Plaintiff had established a *prima facie* case of pay discrimination, her claim fails nonetheless, because she did not establish that Defendant's nondiscriminatory explanation for paying Plaintiff slightly less money than her alleged comparator constitutes pretext.  Moreover, Plaintiff failed to establish *prima facie* cases of discrimination with respect to payment of overload compensation and the selection process for Interim Department Chair.  Regardless, Plaintiff also failed to prove that Defendant's nondiscriminatory explanations for such actions qualify as pretext for illegal discrimination.  Thus, Plaintiff's Title VII discrimination claim cannot succeed, and Defendant stands entitled to summary judgment on Count One.

### C.    Retaliation in Violation of Title VII and the EPA (Counts Two and Four)

Finally, Plaintiff claims that Defendant took actions that constituted retaliation in violation of the EPA and Title VII.  (Am. Compl. ¶¶ 156–60, 171–76; MSJ Opp. at 23–26.) Defendant disagrees, arguing that Plaintiff's retaliation claims fail as a matter of law, because she fails to proffer direct or circumstantial retaliation evidence.  (MSJ Mem. at 14–21.)  Because Plaintiff fails to establish a *prima facie* case of retaliation or demonstrate that Defendant's

nondiscriminatory explanation constitutes pretext, Defendant stands entitled to summary judgment on Plaintiff's Title VII and EPA retaliation claims (Counts Two and Four).

### 1.    Statute of Limitations

As discussed above, Plaintiff has failed to establish that Defendant's alleged violation of the EPA qualified as "willful." *See supra* Section III.A.1. Thus, the Court applies a two-year statutory limitation to Plaintiff's EPA claims, triggering a cut off of November 15, 2021. Moreover, Plaintiff's Title VII claims possess a November 7, 2020 statute of limitations. *See supra* Section III.B.1. Thus, the Court will analyze these claims in tandem, mindful of the different temporal limitations for each.

### 2.    Legal Framework

To state a *prima facie* claim for retaliation, Plaintiff must plausibly allege (1) that she "engaged in a protected activity"; (2) that "the employer acted adversely against" her; and (3) the existence of "a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).

Moreover, plaintiffs may prove *either* a Title VII retaliation *or* an EPA retaliation claim through (a) "direct evidence of retaliatory animus" or (b) the three-pronged approach outlined above, *i.e.*, (1) protected activity, (2) adverse employment action and (3) causation. *Lee v. Belvac Prod. Mach., Inc.*, 2022 WL 4996507, at *2 (4th Cir. Oct. 4, 2022). Accordingly, the Court analyzes Plaintiff's Title VII and EPA retaliation claims in tandem.

For the first element, protected activity includes opposing employment practices that prove either "actually unlawful under Title VII" or those "reasonably believe[d]" by the employee to be unlawful. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015). Courts take an "expansive view of what constitutes oppositional conduct." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). Protected activity "encompasses utilizing

informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). That said, lodging a general complaint of harassment or discrimination, without any connection to a protected class, will not suffice. *Young v. HP Enter. Servs., LLC*, 2011 WL 3901881, at *5 (E.D. Va. Sept. 6, 2011), *aff'd sub nom.*, 471 F. App'x 133 (4th Cir. 2012).

For the second element, the Supreme Court has held that a materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Courts must conduct a fact-specific analysis in each case to determine whether an employer's actions would have deterred a reasonable employee from seeking protection under Title VII or the EPA. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.") That said, a materially adverse employment action does not include "those petty slights or minor annoyances that often take place at work and that all employees experience." *Laughlin*, 149 F.3d at 259.

For the third element, "retaliation claims must be proved according to the traditional principles of but-for causation," requiring "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas So. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To establish but-for causation, a plaintiff can either show a temporal proximity between the protected activity and adverse action, or other relevant evidence that indicates "continuing retaliatory conduct and animus" toward the plaintiff. *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 156 (4th Cir. 2023).

Moreover, as with a discrimination claim under Title VII, once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "proffer evidence of a legitimate, nondiscriminatory reason for taking the adverse employment action." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001).

### 3.    Analysis

At the pleading stage, the Court determined that just one of Plaintiff's retaliation claims survived: VSU's alleged failure to promote her to Chair or Interim Department Chair. (ECF No. 28 at 37.) Specifically, the Court determined that Plaintiff's allegations that she emailed Dr. Palm "[s]oon" after March 16, 2021, highlighting her credentials for the Chair position, and that in April 2021, VSU nonetheless reappointed a man (Mr. Gordon) to the role instead of her, (Am. Compl. ¶¶ 85–86), satisfied the elements of a retaliation claim at the pleading stage. (ECF No. 28 at 38.) The Court concluded that Plaintiff's remaining claims either stood time-barred or failed, even at the pleading stage, to demonstrate the necessary elements of a retaliation claim. (*Id.* at 34–37.)

Additionally, because the Court determined above that a two-year statute of limitations applies to Plaintiff's EPA claims, Plaintiff's EPA retaliation claim stands time barred, because the only remaining retaliation allegation occurred in March and April 2021, well before the November 15, 2021 statute of limitations period. However, given the November 7, 2020 statute of limitations for Plaintiff's Title VII claims, this allegation stands timely. Thus, the Court proceeds to analyze Plaintiff's retaliation claim only under Title VII.

First, despite Plaintiff's conclusory allegation stating otherwise, (MSJ Opp. at 24–25), Plaintiff fails to allege direct evidence of retaliation. Moving to factor one of the three-pronged approach, the Court determined above that none of Defendant's alleged conduct violated Title

VII.  *See supra* Section III.B.3.  The Court therefore examines whether Plaintiff reasonably believed that Defendant's conduct proved unlawful.  *Boyer-Liberto*, 786 F.3d at 282.  The Court finds that she did for two reasons.  First, Plaintiff stated that the Chair selection "process has always been administered improperly and with bias."  (ECF No. 51-2 at 12.)  And while "lodging a general complaint of . . . discrimination, without any connection to a protected class" proves insufficient, *Young*, 2011 WL 3901881, at *5, Plaintiff further states that she hoped that Dr Palm would "treat [her] in the same manner as [he] [had] previously treated the other male candidates."  (ECF No. 51-2 at 12.)  Moreover, reporting such suspected violations to a supervisor like VSU's Provost constitutes oppositional action.  *See Laughlin*, 149 F.3d at 259 (noting that protected activity includes "voicing one's opinions in order to bring attention to an employer's discriminatory activities").  Thus, even though the Court determined that Defendant's conduct did not amount to Title VII discrimination, the Court still finds that Plaintiff reasonably believed that the alleged conduct did, in fact, constitute a Title VII violation.  *See Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 360–63 (E.D. Va. 2015) (holding that plaintiff's report of incidents amounted to protected activity, despite court's determination that alleged conduct did not constitute discrimination, because plaintiff reasonably believed that such conduct amounted to a Title VII violation).

As to the second element, failing to promote Plaintiff qualifies as a materially adverse employment action.  *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (finding that an adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits").

However, Plaintiff's claim fails on the final element:  but-for causation.  Plaintiff sent the email at issue to Dr. Palm on March 16, 2021.  (ECF No. 51-2 at 12.)  Here, Plaintiff states that Dr. Palm then reappointed Mr. Gordon to the Interim Department Chair position "just a few weeks later," (MSJ Opp. at 24), or "in April 2021," (Am. Compl. ¶ 86).  Plaintiff also cites her declaration in support of this proposition.  (Pl.'s Decl. ¶ 91.)  But as previously noted, Plaintiff's self-serving declaration cannot create a genuine issue of material fact.  *See Miller*, 64 F.4th at 576 ("[A] party's self-serving opinion cannot . . . defeat summary judgment.").  Moreover, Defendant presents objective evidence that Mr. Gordon was in fact reappointed to the Interim Department Chair position on June 17, 2021.  (ECF No. 51-4.)  The difference between March 16, 2021 and June 17, 2021 is approximately three months, which the Court finds fails to establish a temporal causal link between Plaintiff's email (protected activity) and Defendant's failure to promote Plaintiff to Interim Department Chair (adverse employment action).  *See Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (finding that plaintiff's termination did not "closely follow" his report of harassment three months earlier).  Plaintiff presents no additional evidence that the Court has not already rejected to establish a causal relationship between her March 16, 2021 email and the re-selection of Mr. Gordon to Interim Department Chair.  As a result, Plaintiff fails to establish but-for causation for her retaliation claim, thus dooming her *prima facie* retaliation case.

Furthermore, even if Plaintiff had established but-for causation, she also failed to overcome Defendant's nondiscriminatory explanation for reappointing Mr. Gordon by proving that the proffered reasoning constitutes pretext for discrimination.  Defendant asserts that Dr. Palm reappointed Mr. Gordon to the Interim Department Chair position for the 2021-2022 academic year, because he successfully completed a year in that role during the 2020-2021

academic year.  (Reply at 15.)  Specifically, Dr. Palm stated in his sworn declaration that "Mr. Gordon performed excellently during the 2020-2021 academic year — especially in light of the circumstances presented by the global pandemic.  For those reasons, I decided to reappoint Mr. Gordon as Interim Department Chair for the 2021-2022 academic year."  (ECF No. 51-2 ¶ 15.) Defendant offers no argument in her responsive pleading that this reasoning constitutes pretext for discrimination.  As a result, Plaintiff fails to refute Defendant's "evidence of a legitimate, nondiscriminatory reason for taking the adverse employment action."  *Spriggs*, 242 F.3d at 190.

Because Plaintiff fails to both establish a *prima facie* case of retaliation and prove that Defendant's nondiscriminatory explanation constitutes pretext, Defendant stands entitled to summary judgement on Count Two.  Moreover, because the only remaining accusation of retaliation stands time-barred under the EPA, Defendant also stands entitled to summary judgement on Count Four.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT Defendant's Motion for Summary Judgment, (ECF No. 50), and will DISMISS WITH PREJUDICE Counts One, Two, Three and Four of Plaintiff's Amended Complaint, (ECF No. 33).

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave" after the as-of-right first amendment, and "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Fourth Circuit has instructed that a request to amend should be granted unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile."  *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012).  Here, the Court concludes that further

amendment would be futile, as the Court already permitted Plaintiff to amend her complaint, (ECF No. 27), and discovery has closed with Plaintiff having failed to establish the legal or factual legitimacy of her case.  The Court sees no reason why further amendment would correct the fundamental deficiencies discussed herein.

Accordingly, the Court will DISMISS WITH PREJUDICE all of Plaintiff's claims.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

An appropriate Order shall issue.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: <u>August 5, 2025</u>